Abrahim BABALLAH; Ula Baballah; Ahmad Baballah, Petitioners,

v.

John ASHCROFT, Attorney General, Respondent.

No. 01–71407.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 8, 2002.

Filed July 11, 2003.

Amended May 6, 2004.

Haitham Edward Ballout, Burlingame, CA, for the petitioners.

John C. Cunningham and Jocelyn Lopez Wright, United States Department of Justice, Washington, DC, for the respondent.

Before TASHIMA, THOMAS and PAEZ, Circuit Judges.

## ORDER AMENDING OPINION AND DENYING PETITION FOR REHEARING AND AMENDED OPINION

### ORDER

The opinion filed July 11, 2003 is AMENDED as follows:

1. At page 335 F.3d 981, 992 insert a new footnote 11 following the sentence: "Here, the INS has presented no evidence to rebut the presumption of a well-founded fear of persecution." The text of the footnote reads:

· 11 There is no need to remand to the BIA under *INS v. Ventura*, 537 U.S. 12, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002), to consider whether changed country conditions rebut Baballah's presumptive fear of future persecution. Not only did the INS fail to present evidence of changed conditions for Arab Israelis, it did not argue before the IJ or the BIA that changed country conditions would eliminate Baballah's fear of future persecution. In its brief before the BIA, the INS represented that: "It appears to the service that all relevant issues of fact and law were fully presented to the

immigration court during the course of the hearing." In these circumstances, to provide the INS with another opportunity to present evidence of changed country conditions, when it twice had the chance, but failed to do so, would be exceptionally unfair. We recently expressed concern "that constant remands to the BIA to consider the impact of changed country conditions occurring during the period of litigation of an asylum case would create a 'Zeno's Paradox' where final resolution[of the case] would never be reached." *Hoxha v. Ashcroft*, 319 F.3d 1179, 1185 n. 7 (9th Cir.2003) (quoting *Avetova–Elisseva v. INS*, 213 F.3d 1192, 1198 n. 9 (9th Cir. 2000)). Nonetheless, because the ultimate decision to grant asylum is discretionary, we remand so that the Attorney general may determine whether to grant that relief. *See* 8 U.S.C. § 1158(b)(1).

2. Change existing footnote 11 to footnote 12.

The petition for panel rehearing is DENIED. The panel also voted to deny the petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc, and no active judge of the court has requested a vote on whether to rehear the case en banc. Fed. R.App. P. 35(b). Therefore the petition for rehearing en banc is DENIED.

### OPINION

PAEZ, Circuit Judge.

Abrahim Baballah, a native and citizen of Israel, and his wife and oldest child, petition for review of a decision of the Board of Immigration Appeals ("BIA") affirming the denial of their application for asylum and withholding of removal. Over a ten-year period, Israeli Marines repeatedly threatened and attacked Baballah on account of his ethnicity and religion. The violence that he experienced not only

caused him to fear serious bodily harm and death but also resulted in serious economic hardship. Although the immigration judge ("IJ") deemed Baballah credible, she found that his encounters with the Israeli Marines did not rise to the level of persecution required to qualify for asylum. We conclude that the credible evidence presented by Baballah compels a finding of past persecution, and that the Immigration and Naturalization Service ("INS") failed to rebut the presumption of future persecution. Accordingly, we grant the petition and hold that Baballah and his family are eligible for asylum and entitled to withholding of removal.

## I.

Abrahim Baballah is an Israeli Arab.[1] Baballah's parents were the only Jew and Muslim to marry in his hometown of Aka, Israel, a town of approximately 11,000 people on the Mediterranean coast.[2] As a result of their mixed marriage Baballah suffered repeated instances of discrimination when seeking work as a young man. Although Baballah had studied to be an accountant, bank officials refused to hire him when they discovered his background. These officials told him that he would "follow in [his] father's footsteps" and called him a "goy," a word that means "non-Jew" in Hebrew and has derogatory connotations in Arabic, meaning "dirty," "bastard," or "born from nowhere." Unable to find employment as an accountant, he trained to be a lifeguard and diver. However, when Baballah sought such employment, he was called "goy" and turned away.

Despairing of finding other employment, Baballah went to work for his family as a fisherman. During the ten years that he worked as a fisherman, he was the victim of incessant threats and acts of violence by the Israeli Marines, who relentlessly harassed him. Although the Israeli Marines did not confront other fishermen, when they saw Baballah, they sped up to his fishing boat in their larger vessel and circled near him, causing his boat to rock precipitously and fill with water. At times, the Marines shot bullets in the air over Baballah's boat and threw eggs at Baballah and his crew. On other occasions, they turned six-inch water hoses on Baballah's boat, forcing Baballah and his crew to bail out the water from the boat so that it would not sink. During one such incident, when Baballah was fishing with one of his brothers, the Israeli Marines boarded their boat, tied his brother to a pole, and sprayed him with pressurized water in freezing weather. The brother was then accused of assault, arrested, and ultimately imprisoned for over a year. As a result of the imprisonment, Baballah's brother suffered a mental impairment and is now dependent upon the family for support.

These aggressive acts, which occurred on a daily basis, caused Baballah and his crew to fear for their lives. These encounters took place both at sea and in town, where the Marines followed Baballah and called him "goy," intending to intimidate him and to let him know that "[w]e're after you."

Not only were these events frightening and dangerous, they also made it impossible for Baballah to earn a living. The repeated threats and attacks made it very difficult for Baballah to retain a boat crew.

---

**1.** Because Baballah was found credible and his testimony is thus accepted as undisputed, the facts recounted here are derived from his testimony. *See Singh v. INS*, 94 F.3d 1353, 1356 (9th Cir.1996) (*R.J. Singh*).

**2.** The parties refer to Baballah's hometown as "Aka," but it appears to be more commonly known as "Akko" or "Akka."

Moreover, the Israeli Marines deliberately targeted Baballah through economic means. When the Israeli Marines saw that Baballah was catching large quantities of fish, they would destroy his fishing nets by steering their vessel over them so that the vessel's propellers would damage the nets, forcing Baballah to "spend days and days just fixing the nets for the fish." Like the United States Coast Guard, the Israeli Marines are responsible for rendering aid to fishermen and others at sea, managing the waterways, and enforcing general maritime laws. However, rather than enforcing the laws impartially, the Israeli Marines singled Baballah out for unwarranted citations, which, with the payment of substantial fines, made it difficult for him to earn a living.[3]

After eight years of struggling to support his family as a fisherman, Baballah mortgaged his home to buy a $30,000 speedboat,[4] with which he intended to earn a living by offering pleasure trips. Three months after he bought the boat, however, it was destroyed by fire in the middle of the night. Although Baballah was convinced that the Israeli Marines were behind the loss of his boat, there was no evidence regarding who was responsible for the blaze.

Having lost his speedboat, Baballah was forced to return to fishing. To Baballah's misfortune, however, his fishing boat was destroyed by Israeli Marines when, after drifting into shallow waters, he accepted an offer of help from them. Despite Baballah's protests that the boat should be towed from the middle, the Marines tied a tow rope on the front end of the boat.

When the Marines began to tow the boat, it split apart. As the boat broke apart, the Marines mocked Baballah and "laugh[ed] sarcastically."

Israeli authorities also harassed members of Baballah's family. They confiscated his father's land and livestock "because my father made my mother Muslim, they want revenge." One of Baballah's brothers was persistently called "goy" and refused employment in their hometown. He eventually moved to Tel Aviv and was forced to pass as Jewish in order to escape persecution. Another brother was denied a chance to compete in the Olympics because he would not convert to Judaism.

In 1990, Baballah and his family made a brief trip to the United States but returned to Israel when they received word that their home was going to be taken away. However, upon their return, Baballah realized that they could not stay in Israel because once again "I couldn't work.... I couldn't do anything." Thus, the Baballahs returned to the United States on July 27, 1992.

## II.

At their exclusion hearing, Baballah and his wife and minor son admitted their excludability pursuant to section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(7)(A)(i)(I).[5] They requested asylum under section 208 of the INA, 8 U.S.C. § 1158, and withholding of removal under section 243(h) of the INA, 8 U.S.C. § 1253(h).

---

**3.** Baballah testified that he received anywhere from one to four citations a month, each of which had a fine of 250–500 shekels ($170–$180).

**4.** Baballah reported that, because Arabs were charged more than Jews, this mortgage bore an extremely high interest rate.

**5.** Baballah's wife and minor son, respectively, Ula Baballah and Ahmad Baballah, are included in his application for asylum and withholding of removal. Their eligibility is derivative of Baballah's. 8 C.F.R. § 208.21(a). Abrahim and Ula Baballah also have two children who are United States citizens.

The IJ found Baballah's testimony to be credible. She concluded, however, that neither alone nor cumulatively did the events described by Baballah rise to the level of persecution, stating that the evidence did not show that Baballah would be unable to support his family if required to return. Although she acknowledged the "severe hostility" and "serious tension" between Jews and Arabs in the Middle East, she questioned whether the violence and other acts directed at Baballah were based upon a protected ground. Additionally, the IJ dismissed Baballah's testimony that he was singled out to receive maritime citations, stating that "it is apparent that any country can have laws and it is allowed to enforce those laws. These [citations] appear to be in relation to the business and occupation of this applicant." The IJ also noted that the Baballahs returned to live in Israel for some time after their initial visit to the United States. As a result, the IJ denied Baballah and his family asylum and withholding of removal. She also found that Baballah and his family were likely to become public charges and thus were excludable under section .212(a)(4) of the INA, 8 U.S.C. § 1182(a)(4).

The BIA affirmed the IJ's determination that Baballah had not shown persecution, but reversed the finding that Baballah and his family were likely to become public charges. The BIA did not conduct a *de novo* review of the IJ's denial of asylum, stating conclusorily that the IJ properly evaluated Baballah's asylum claim and that Baballah's encounters with the Israeli Marines did not constitute persecution.

## III.

■ To the extent that the BIA incorporates the IJ's decision as its own, we treat the IJ's statement of reasons as the BIA's.[6] *Gonzalez v. INS,* 82 F.3d 903, 907 (9th Cir.1996). Where, as here, the IJ finds the applicant's testimony to be credible and the BIA makes no contrary finding, we accept as undisputed the testimony of the applicant. *Ranjit John Singh,* 94 F.3d at 1356. The BIA's determination of pure legal questions is reviewed *de novo. Id.* at 1358; *Fisher v. INS,* 79 F.3d 955, 961 (9th Cir.1996) (en banc). We must uphold the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). The BIA's determination can be overturned only if the evidence presented by the applicant was such that a reasonable fact finder would have to conclude that the requisite fear of persecution existed. *Id.*

## IV.

To be eligible for a grant of asylum, Baballah must show that he is a refugee. 8 U.S.C. § 1158(b)(1). A refugee is one who is "unable or unwilling to avail himself or herself of the protection of [his or her native] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

---

6. We have jurisdiction under section 106 of the INA, codified at 8 U.S.C. § 1105a(a)(1) (1996), amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104–208, 110 Stat. 3009–546 (Sept. 30, 1996). *Kalaw v. INS,* 133 F.3d 1147, 1150 (9th Cir.1997). Be-

cause the final order of deportation in this case was filed after October 30, 1996 and was pending on April 1, 1997, the BIA's decision is reviewed under the transitional rules of IIRIRA. *Id;* IIRIRA § 309(c), codified at 8 U.S.C. § 1101.

**1074**

To establish a well-founded fear of persecution, the applicant must establish both a genuine subjective fear of persecution and an objective basis for that fear. *Singh v. INS,* 134 F.3d 962, 966 (9th Cir.1998) (*B. Singh*). Here, as noted, the IJ found Baballah's testimony regarding his fear to be credible, thus establishing the subjective element of his claim. *Id.* The objective prong requires a showing of "some direct, credible evidence supporting the claim." *Sarvia–Quintanilla v. INS,* 767 F.2d 1387, 1394 (9th Cir.1985). Baballah can meet the objective prong of this test by showing that he suffered persecution in the past "because '[a]n alien who establishes past persecution is presumed to have a well-founded fear of future persecution.'" *B. Singh,* 134 F.3d at 967 (quoting *Gaya Prasad v. INS,* 101 F.3d 614, 617 (9th Cir.1996)) (alteration in original).

In order to show past persecution, Baballah must demonstrate 1) that his encounters with the Israeli Marines rise to the level of persecution; 2) that the persecution was on account of one or more of the five protected grounds; and 3) that the persecution was committed either by the government or by forces that the government was unable or unwilling to control. *Chand v. INS,* 222 F.3d 1066, 1073 (9th Cir.2000).

### A.

As we have recognized, persecution is not defined in the INA. *B. Singh,* 134 F.3d at 967. However, we have defined persecution as "the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive." *Fisher,* 79 F.3d at 961 (internal quotation marks omitted); *see also Kovac v. INS,* 407 F.2d 102, 107 (9th Cir.1969). There is "no question that persistent death threats and assaults on one's life, family, and business rise to the

level of persecution within the meaning of the Act." *R.J. Singh,* 94 F.3d at 1360. Because Israeli Marines assaulted Baballah, his crew, his brother, and his business, he has established past persecution.

### Threats and Attacks

Threats and attacks can constitute persecution even where an applicant has not been beaten or physically harmed. *See, e.g., Artiga Turcios v. INS,* 829 F.2d 720, 723–24 (9th Cir.1987) (holding that petitioner had established persecution although he had not been physically harmed and received only an indirect threat relayed by a neighbor); *Surita,* 95 F.3d at 819 (concluding that petitioner had established persecution when the evidence showed that she had been robbed numerous times in the course of a week or ten days but not physically harmed); *R.J. Singh,* 94 F.3d at 1360 (holding that the petitioner established persecution when verbal threats were followed by multiple other attacks, although the only actual injury sustained was bruising of the ribs).

The events described by Baballah—Israeli Marines circling rapidly around his boat causing it to fill with water and endangering Baballah and his crew, shooting bullets over the boat, spraying highly pressurized water at Baballah's boat and its occupants in freezing temperatures—were not simply threats, but actual attacks. These attacks occurred repeatedly over a period of ten years, were sufficiently threatening that Baballah's crew members were unwilling to continue in his employ, and were clearly intended to make Baballah fear that the Israeli Marines would kill or seriously harm him.

The treatment of Baballah's brother demonstrated that these threats were not idle. Violence directed against an applicant's family members provides support for a claim of persecution and in

some instances is sufficient to establish persecution because such evidence "may well show that [an applicant's] fear . . . of persecution is well founded." U.N. HIGH COMM'R FOR REFUGEES, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees*, II(B)(2)(a), ¶ 43 (Geneva 1992); *see also Hernandez–Ortiz v. INS*, 777 F.2d 509, 515 (9th Cir.1985); *Rodriguez v. INS*, 841 F.2d 865, 870–71 (9th Cir.1987). Here, the Israeli Marines tied Baballah's brother to a pole and sprayed him with pressurized water in freezing weather. The brother was subsequently arrested and imprisoned for assault, and due to the imprisonment, he now suffers from a mental impairment. The physical abuse and imprisonment of Baballah's brother occurred as an extension of the threats and attacks regularly directed against Baballah, and adds additional strength to his claim of past persecution because it demonstrated that the danger threatened by the Marines' menacing behavior was real.

### Economic Persecution

■ In addition to the persecution noted above, the hostile encounters with the Israeli Marines made it virtually impossible for Baballah to earn a living. "We have recognized that purely economic harm can rise to the level of persecution where there is 'a probability of deliberate imposition of substantial economic disadvantage' upon the applicant on account of a protected ground." *Chand*, 222 F.3d at 1074 (quoting *Kovac v. INS*, 407 F.2d at 107, and *Gonzalez v. INS*, 82 F.3d 903, 910 (9th Cir.1996), and discussing a number of cases in which "[e]conomic persecution has been credited as an important part of asylum claims").[7] In *Kovac*, we noted that, by removing the word physical from the description of persecution, Congress provided that economic persecution alone could sustain an asylum claim. 407 F.2d at 105–06. We held that Kovac, a chef who was forced from several jobs and thereafter refused employment as a chef because of his refusal to cooperate with the Yugoslavian secret police, was eligible for asylum despite the fact that he was able to find work in the merchant marines. *Id.* at 107. In so holding, we concluded that Kovac was not required to show an absolute inability to support his family in order to be eligible for asylum. *Id.*

Here, after Baballah's attempts to obtain employment as an accountant and lifeguard were thwarted, Israeli Marines deliberately interfered with his attempts to maintain a fishing business through the dangerous intimidation tactics described above. The Marines targeted Baballah's livelihood by purposely destroying his fishing nets, which forced him to spend days repairing them, by frightening away his crew, and by singling him out to receive unwarranted citations that were costly to resolve.[8] The IJ dismissed the citations as legitimate law enforcement, ignoring Baballah's testimony that the citations involved discriminatory harassment because of his mixed background: "It's discrimination. It's not because I was doing something wrong. When they found out who I

---

7. Economic persecution on account of a protected ground is distinct from persecution solely on account of an economic motive, for which our precedent precludes relief. *See Maini v. INS*, 212 F.3d 1167, 1176 n. 1 (9th Cir.2000).

8. Baballah argues that the IJ erred in not admitting into evidence photocopies of the citations. However, since the IJ credited Baballah's testimony regarding the citations, the documentary evidence, although corroborative of Baballah's testimony, would have no further probative value. *See Shoafera v. INS*, 228 F.3d 1070, 1075 (9th Cir.2000). Thus, any error that may have occurred was harmless.

am, they will come and give me a ticket." Ultimately, Baballah's fishing boat was destroyed by the Israeli Marines when they ignored Baballah's directions for towing it.

 In light of this credible evidence, the IJ's finding that "[t]he[r]e is nothing to indicate that this applicant would be unable to continue to support his family if he was[sic] required to return to Israel" is without merit. The IJ erred as a matter of law by requiring that Baballah show an absolute inability to support his family. *Kovac*, 407 F.2d at 107. Moreover, the IJ ignored the fact that the Israeli Marines targeted Baballah and deliberately caused him economic suffering because of his ethnic and religious background, ultimately leading to the demise of his fishing business.

### Cumulative Impact

 Although the IJ described the threats, attacks, and economic hardship inflicted on Baballah, she made no reference to them in concluding that Baballah had not suffered persecution. An applicant may suffer persecution because of the cumulative impact of several incidents even where no single incident would constitute persecution on its own. *Surita*, 95 F.3d at 819; *Chand*, 222 F.3d at 1074; *Shirazi–Parsa v. INS*, 14 F.3d 1424, 1428 (9th Cir.1994), *overruled on other grounds by Fisher*, 79 F.3d 955. When analyzed in the aggregate, the physical assaults and economic harassment endured by Baballah compel a finding of persecution.

In *Khourassany v. INS*, we found that an Arab Israeli had not suffered persecution when he was neither physically attacked nor threatened with harm, and where, despite being forced to close one restaurant, he continued to operate several other businesses. 208 F.3d 1096, 1100–01 (9th Cir.2000). In contrast, in *Surita*, we held an Indo–Fijian suffered persecution when she was robbed more than fifteen

times going to and from work, and quit her job as a result. 95 F.3d at 819–20. Here, Baballah was the victim of terrifying attacks on a frequent basis over a ten-year period, was forced to change occupations, and risked his life in frustrated attempts to earn a livelihood. We have found that the severity of harm is compounded when incidents of persecution have occurred on more than one occasion, particularly where "an applicant ... is victimized at different times over a period of years." *Chand*, 222 F.3d at 1073–74. Taken together, the threats and violent assaults against Baballah and his business cannot be dismissed as mere discriminatory harassment.

In rejecting Baballah's persecution claim, the IJ noted the "severe hostility" and "serious tension" between Jews and Arabs in the Middle East, implying that Baballah's confrontations with the Marines were no different from those experienced by others due to "general conditions of violence," *Chand*, 222 F.3d at 1075, and plainly ignoring the numerous specific instances of persecution he recounted. We have held that "the Board of Immigration Appeals erred as a matter of law when it concluded that specific threats are insufficient to establish a threat of persecution if they are representative of a general level of violence in a foreign country." *Bolanos–Hernandez v. INS*, 767 F.2d 1277, 1288 (9th Cir.1984). In *Bolanos*, we emphasized that "[i]f anything, ... [the fact that the individual resides in a country where the lives and freedom of a large number of persons has been threatened] may make the threat *more* serious or credible." *Id.* at 1284–85 (emphasis added); *see also Chand*, 222 F.3d at 1076 (noting that where "many members of [a protected] group are targeted for persecution, *less* of an individualized showing is required to qualify for asylum, *not more*" (emphasis in original)); *R.J. Singh*, 94 F.3d at 1359. Baballah did not rely on the general threat of danger to individuals

with a mixed ethnic background; his testimony was replete with specific instances in which he was individually singled out for abuse by Israeli Marines. The IJ's suggestion that the threats and attacks experienced by Baballah and his family cannot be considered persecution because of generally dangerous conditions is at odds with our case law.

### B.

 Baballah testified that he was persecuted on account of his parents's intermarriage and because he and his mother converted to Islam.[9] Because it is difficult to conclusively prove motive, Baballah need only "provide *some* evidence of [motive], direct or circumstantial," *Elias–Zacarias*, 502 U.S. at 483, 112 S.Ct. 812, and demonstrate the connection between the government's actions and his membership in a protected group, *Fisher*, 79 F.3d at 962. "[U]ncontroverted and credible testimony is sufficient to establish that [an asylum applicant] was persecuted on account of ethnicity." *Shoafera v. INS*, 228 F.3d at 1075. We have established that persecution "for marrying between races, religions, nationalities, social group memberships, or . . . political opinion is . . . persecution on account of a protected ground." *Maini*, 212 F.3d at 1175 (finding persecution due to an interfaith marriage to be "on account of religion"). In *Maini*,

we also held that persecution of children of an intermarriage due to their mixed parentage is on account of a protected ground. *Id.* at 1176.

These standards mean that in order for Baballah to meet the "on account of" prong, he only is required to provide some evidence that in persecuting him, the Israeli Marines were motivated by ethnicity,[10] religion, or the fact that Baballah was the child of a religious and ethnic intermarriage. In the course of persecuting Baballah, the Israeli Marines called him "goy," a word that means non-Jew and that is derogatory to Arabs. The use of this slur amply establishes the connection between the acts of persecution and Baballah's ethnicity and religion. *See, e.g., Duarte de Guinac*, 179 F.3d at 1162 (noting that motivation was on account of ethnicity where persecution was "coupled with explicit expressions of ethnic hatred"); *Maini*, 212 F.3d at 1176 (same, in context of religion). Baballah has shown credible, nonspeculative insight into the motivation of his persecutors. *See Shoafera*, 228 F.3d at 1075. Both Baballah's belief and the use of the derogatory slur "goy" demonstrate that the Israeli Marines were motivated by Baballah's ethnicity and religion.

### C.

The final factor that Baballah must establish is that the persecution he suffered

9. The strong correlation between ethnicity and religion in the Middle East makes it difficult to determine whether it was one or both of these categories that was responsible for Baballah's persecution. We need not make this determination, since both categories are protected. *Cf. Gafoor v. INS*, 231 F.3d 645, 651 (9th Cir.2000) (finding that applicant was persecuted on account of race and political opinion). Baballah also claims that he was persecuted on account of membership in two social groups—children of intermarriages and Arab Israelis. We need not address these claims under our social group jurisprudence, because the "on account of" requirement is

satisfied by the protected grounds of ethnicity and religion.

10. We use "ethnicity" to designate one of the grounds for Baballah's persecution. Our precedent establishes that "the term ethnicity describes a category which falls somewhere between and within the protected grounds of race and nationality." *Shoafera*, 228 F.3d at 1074 n. 2 (quoting *Duarte de Guinac v. INS*, 179 F.3d 1156, 1159 n. 5 (9th Cir.1999)) (internal quotation marks omitted). Here, we use the more precise term "ethnicity" rather than "race."

was committed by the government or by forces that the government was unable or unwilling to control. *Chand,* 222 F.3d at 1073. This factor is clearly met here because the Israeli Marines are governmental actors who were responsible for the deliberate life-threatening attacks against Baballah and his business.

■ The INS argues that "Baballah never complained to the police about any of the claimed incidents of persecution, and therefore failed to show that Israel's civilian government was unwilling or unable to help him." However, when the government is responsible for persecution, the third prong of our asylum inquiry is satisfied without further analysis. As a result, no inquiry into whether a petitioner reported the persecution to police is necessary. *See Chanchavac v. INS,* 207 F.3d 584 (9th Cir.2000) (determining that attacks by military constituted persecution, without requiring a complaint to civilian authorities); *Navas v. INS,* 217 F.3d 646, 655–56 (9th Cir.2000) (holding that where military murdered petitioner's aunt and tried to kill him, there was no question that the third prong was met). Only where non-governmental actors are responsible for persecution do we consider whether an applicant reported the incidents to police, because in such cases a

report of this nature may show governmental inability to control the actors. *B. Singh,* 134 F.3d at 968; *Surita,* 95 F.3d at 819. In Baballah's case, there is no question that the perpetrators of the persecution were themselves government actors, conclusively establishing the third prong of the analysis by showing governmental involvement.

## D.

■ Because any reasonable fact finder would be compelled to find that the destruction of Baballah's business and threats to his well-being constituted persecution, we hold that the IJ's decision was not supported by substantial evidence. This showing of past persecution presumptively demonstrates a well-founded fear of future persecution, unless "a preponderance of the evidence" establishes "a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution." 8 C.F.R. § 208.13(b)(1). The burden is on the INS to demonstrate that conditions have changed. *Duarte de Guinac,* 179 F.3d at 1163; 8 C.F.R. § 208.13(b)(1)(ii). Here, the INS has presented no evidence to rebut the presumption of a well-founded fear of persecution.[11]

---

11. There is no need to remand to the BIA under *INS v. Ventura,* 537 U.S. 12, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002), to consider whether changed country conditions rebut Baballah's presumptive fear of future persecution. Not only did the INS fail to present evidence of changed conditions for Arab Israelis, it did not argue before the IJ or the BIA that changed country conditions would eliminate Baballah's fear of future persecution. In its brief before the BIA, the INS represented that: "It appears to the service that all relevant issues of fact and law were fully presented to the immigration court during the course of the hearing." In these circumstances, to provide the INS with another opportunity to present evidence of changed

country conditions, when it twice had the chance, but failed to do so, would be exceptionally unfair. We recently expressed concern "that constant remands to the BIA to consider the impact of changed country conditions occurring during the period of litigation of an asylum case would create a 'Zeno's Paradox' where final resolution [of the case] would never be reached." *Hoxha v. Ashcroft,* 319 F.3d 1179, 1185 n. 7 (9th Cir.2003) (quoting *Avetova–Elisseva v. INS,* 213 F.3d 1192, 1198 n. 9 (9th Cir.2000)). Nonetheless, because the ultimate decision to grant asylum is discretionary, we remand so that the Attorney general may determine whether to grant that relief. *See* 8 U.S.C. § 1158(b)(1).

Indeed, the State Department Advisory Opinion supports, rather than undermines, Baballah's application for asylum.[12] The INS has failed to rebut the presumption that Baballah has a well-founded fear of future persecution, and thus we conclude that Baballah and his family are statutorily eligible for asylum.

## V.

 Because Baballah has established that he suffered past persecution such that his life and livelihood were threatened on account of his ethnicity and religion, a presumption arises that he is entitled to withholding of removal. *Salazar–Paucar v. INS*, 281 F.3d 1069, 1077 (9th Cir.), *as amended by* 290 F.3d 964 (2002); *see also Duarte de Guinac*, 179 F.3d at 1164; *Surita*, 95 F.3d at 821; 8 C.F.R. § 208.16(b)(1)(i) ("If the applicant is determined to have suffered past persecution in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion, it shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim."). Because the INS has failed to rebut this presumption, we conclude that it is "more likely than not that [Baballah] would be subject to persecution" upon returning to Israel. *INS v. Stevic*, 467 U.S. 407, 424, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). Accordingly, Baballah is entitled to withholding of deportation.

## VI.

We conclude that Baballah suffered past persecution and that he has shown a genuine and well-founded fear of future persecution should he return to Israel. Under these circumstances, he and his family are eligible for asylum. We also conclude that Baballah and his family are entitled to withholding of removal. We remand this case to the BIA for the Attorney General to exercise his discretion, under 8 U.S.C. § 1158(b) as to whether to grant asylum, and for an appropriate order withholding removal of Baballah and his family.

Petition **GRANTED; REMANDED** for further proceedings.

---

12. The advisory opinion stated that "[t]here certainly can be tension, and worse, at the local level between Israeli Arabs and Israeli Jews" and suggested that the IJ's decision should hinge upon the credibility of Baballah's application.