**Mamadou NDOM, Petitioner,**

v.

**John ASHCROFT, Attorney General, Respondent.**

No. 02–74419.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 16, 2004.

Filed Sept. 10, 2004.

Rochelle A. Fortier Nwadibia, Privitera & Nwadibia, San Francisco, CA, for the petitioner.

Emily Anne Radford and Keith I. Bernstein, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, DC, for the respondent.

Before: T.G. NELSON, W. FLETCHER, and BERZON, Circuit Judges.

BERZON, Circuit Judge:

Mamadou Ndom, a native and citizen of Senegal from the Casamance region of that country, left Casamance when it was plagued by armed conflict between government forces and secessionist rebels. He petitions for review of an order by the Board of Immigration Appeals ("BIA") that affirmed without opinion an Immigration Judge's ("IJ") denial of Ndom's application for asylum and withholding of removal. *See* 8 C.F.R. § 1003.1(e)(4). We grant the petition for review in part and remand.

## Background

### I. Conditions in the Casamance Region of Senegal

Documentary evidence in the record establishes that Casamance is the southernmost region of Senegal, bordered by the Gambia to the north and Guinea–Bissau to the south. The *Mouvement des forces démocratiques de Casamance* ("MFDC") has been seeking independence for Casamance since 1982, when students marched on the regional capital. In May 1990, after years of violent demonstrations and increasing military and judicial suppression, the MFDC launched a campaign of armed opposition to the Senegalese government. *See* Amnesty International, *Senegal: Climate of Terror in Casamance*, at 4 (Mar. 5, 1998)[hereinafter, *Climate of Terror*].[1] Armed conflict between the MFDC and the Senegalese armed forces erupted regularly, despite several short-lived ceasefire agreements. *See Climate of Terror*, at 5; U.S. Department of State, *Country Reports on Human Rights Practices for 1999—Senegal*, at 1 (Feb. 25, 2000)[hereinafter, *1999 Country Report*]; Amnesty International, *Senegal: Casamance civilians*

---

1. All cited documentary materials are in the certified administrative record.

*shelled by the* Mouvement des forces démocratiques de Casamance *(MFDC),* at 1 (June 30, 1999).

Government human rights abuses in Casamance are well-documented. "Hundreds of civilians have been arrested and tortured by the security forces. Numerous people have been the victims of extrajudicial executions and dozens of others have 'disappeared' after their arrest and never been seen again." *Climate of Terror,* at 1; *see also 1999 Country Report,* at 4 (citing the Amnesty International findings).

Most of those arrested and charged with threatening State security "can be considered to be prisoners of conscience—that is, people imprisoned for, among other things, their political opinions or ethnic origin, without using or advocating violence.... In most cases, Casamance civilians have been imprisoned on the basis of anonymous, unverifiable accusations." *Climate of Terror,* at 6–7. Amnesty International has specifically documented the extra-judicial killing and "disappearance" of suspected MFDC sympathizers in Ndom's hometown, Naguis. *See id.* at apps. 1, 2; *see also 1999 Country Report,* at 3(describing allegation by Amnesty International and RADDHO, a Senegalese human rights organization, of a mass grave for victims of extrajudicial executions in Naguis). Amnesty International and RADDHO have also documented the existence of a mass grave for victims of extra-judicial killings in Ziguinchor, the regional capital of Casamance. *See Climate of Terror,* at 37.

Human rights abuses by the MFDC are also well-documented. *See 1999 Country Report,* at 3. According to Amnesty International, the MFDC has "seriously abused human rights by killing villagers who have refused to give them food or money and by killing civilians suspected of collaborating with the Senegalese authorities." *Climate of Terror,* at 38.

Consistent with the documents in the record, the IJ found that "Casamance is a conflictive area ... because of the fighting between the MFDC and the government forces.... The atrocities or human rights violations are attributed to both sides."

## II. Ndom's Experience

The IJ found Ndom's testimony to be credible. We therefore accept Ndom's testimony as true. *Vukmirovic v. Ashcroft,* 362 F.3d 1247, 1251 (9th Cir.2004).

Ndom worked on his family's farm in Naguis, a town in Casamance, supplementing his farm income by selling fish at a local market. He testified that his physical appearance identifies him as being from Casamance. In 1990, at age 15, Ndom joined the MFDC. At that time, nearly all the residents of Naguis supported the MFDC. Ndom joined the organization, and continues to sympathize with its goal of secession, because he believes that Casamance's substantial natural resources are exploited by the Senegalese government and thus are not available to benefit the people of Casamance. To join the MFDC, Ndom was required to attend meetings and to "support the MFDC morally."

By 1993, according to Ndom, the MFDC had renounced its prior non-violent approach to secession and was increasingly killing civilians, including children and some of Ndom's acquaintances. Ndom therefore decided to leave the MFDC. He did not resign officially as he feared that he would be killed if he did, but instead stopped attending MFDC meetings and made excuses for doing so.

Subsequently, Ndom was twice arrested and detained by the Senegalese authorities. On December 27, 1994, after MFDC and government forces had clashed near Naguis, between five and seven plain-

clothes police officers arrested Ndom at his home. The officers told Ndom that he was needed for questioning and threatened him with force if he did not accompany them. Ndom testified that there had recently been fighting between the MFDC and government forces in the Naguis area, and that "right after the fight, they was arresting people, collectively, and by that time they had arrested me." According to Ndom, large-scale arrests were common after violence between the government and the MFDC: "[Y]ou know we expect . . . to be arrested. You know, they go house to house, you notice people, people looking around, they make like . . . collective arrest[ ]."

Soldiers took Ndom from Naguis to the main police station at Ziguinchor, the regional capital. At the Ziguinchor station, a police commissioner accused Ndom of having participated in a "rebellious manifestation" and instructed him to sign a form confessing to participation in recent guerrilla activity. When Ndom refused, the police commissioner checked a box titled "refuse to sign" on the form. Ndom asked why he was being detained: "they told me because you have participate in the rebel movement."

Ndom was held in a cell in Ziguinchor for two days and then transferred with ten others to the Reubess prison in Dakar, some 300 miles away. In Dakar, Ndom was held for seventeen days in a small, dark cell with ten other people. Ndom was not taken before a judge or formally charged. His captors told him that he would be watched carefully because he now had a record. He was released, with other suspected MFDC members, on January 15, 1995, when the President of Senegal issued a general pardon.

Ndom was arrested by government soldiers again on March 3, 1995, and detained for six days. When asked by the IJ whether his second arrest was "the same type of situation that you were confronted with in 1994," Ndom stated:"[t]hat's exactly the same reason." Once again, Ndom was accused of participation in a recent "rebellious manifestation." According to Ndom's asylum application, approximately 100 of the 400 residents of Naguis, mainly males, were arrested along with him. The soldiers making the second arrest appear to have been aware that Ndom had been arrested previously.

Following his second arrest, Ndom was again taken to the main police station in Ziguinchor. He was questioned by the same police commissioner who had interrogated him previously. The commissioner stated that he recognized Ndom's face, that Ndom was "really taking a risk to die," and that "you know this is your last chance, next time I'm going to take serious action against you." The commissioner later came to Ndom's cell and repeated this threat. As a result of these threats and what he knew about the treatment of others, Ndom feared he would be "disappeared."

Ndom was detained for six days at the police station in Ziguinchor. Although he was not harmed physically, the conditions in the prison were so poor as to cause him "mental torture." He was released without explanation.

Ndom remained in Casamance for two years following his release. Out of fear, he avoided both MFDC members and government security forces. Whenever hostilities broke out between the parties, he would hide in his farm's grain loft to avoid arrest by the government. In April 1997, Ndom was seriously injured when a land mine exploded near him. After his release from the hospital, Ndom resolved to leave Senegal for the United States. He sold the family farm and livestock to pay for a forged passport and passage to Canada.

From Canada, he eventually made his way to Oakland, California.

On July 27, 1998, Ndom was served with a Notice to Appear by the INS[2] charging him with removability for entering the country without a valid visa or other entry document. He applied for asylum and withholding of removal. After several hearings, the IJ denied each of Ndom's applications. He found Ndom's testimony credible and consistent with State Department reports on Casamance. The IJ determined, however, that Ndom had not suffered persecution at the hands of the Senegalese armed forces on account of any protected ground. Ndom's association with the MFDC, the IJ concluded, "was not the principal reason he was arrested." Rather, Ndom was "indiscriminately arrested" along with other residents of Naguis. According to the IJ, Ndom did not fit within the definition of "refugee," because he "was the victim of civil and military strife in the area. Therefore he has not established that he was persecuted on account of any one or more of the five factors for consideration in Senegal."

## ANALYSIS

We must uphold the IJ's decision if supported by reasonable, substantial, and probative evidence in the record. *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). In this case, because the BIA affirmed the IJ's decision without opinion, we review the IJ's decision. *Falcon Carriche v. Ashcroft,* 350 F.3d 845, 849 (9th Cir.2003).

As a preliminary matter, the INS argues that Ndom has waived his asylum and withholding of removal claims by failing to articulate the proper standard of review in his briefs to this court. In his opening brief, Ndom stated that it was "clear from the record" that "it is more likely than not that he will face persecution should he return." The INS argues that "the petitioner is required to show the Court that his record evidence *compels* the finding that he is statutorily eligible for asylum" and that Ndom's failure to so state constitutes a waiver.

We have rejected a similar argument as "entirely lacking in merit," ruling that "[a] failure to recite the proper standard of review does not constitute waiver of a properly raised merits issue." *Mejia v. Ashcroft,* 298 F.3d 873, 877, 876(9th Cir.2002). As Ndom has properly raised and argued his substantive claims of eligibility for asylum and withholding of removal, there has been no waiver.

The INS also contends that Ndom has waived his claim of past persecution by failing to argue it in his brief to this court. We disagree, as Ndom's brief challenges "whether the IJ erred in its finding that the conditions in Casamance were conditions of civil strife," and briefly discusses, under that heading, the evidence concerning Ndom's past persecution, stating: "Where a government exerts its military strength against an individual and there is no reason to believe the individual has engaged in any criminal activity or other conduct that would provide a basis for such action, the most reasonable presumption is that the government's actions are politically motivated." Ndom's brief also defines a well-founded fear as meaning that "a person *has either been actually a victim of persecution* or can show good reason why he fears persecution." Al-

---

**2.** On March 1, 2003, the INS ceased to exist and its functions were transferred to the newly-created Department of Homeland Security. *See Aguilera–Ruiz v. Ashcroft,* 348 F.3d 835, 835 n. * (9th Cir.2003). For the sake of consistency, we will refer to the agency as the INS throughout this opinion.

though inartful, that statement is sufficient to raise a past persecution claim. Further, even if Ndom's brief inadequately discussed the past persecution claim, we retain discretion to review this claim "because the government briefed it, and thus suffers no prejudice from [the petitioner's] failure to properly raise the issue." *Singh v. Ashcroft*, 361 F.3d 1152, 1157 n. 3 (9th Cir.2004).

## I

Ndom claims that he is eligible for asylum and withholding of removal because of past persecution and a well-founded fear of persecution, based both on political opinion and on membership in the group of persons native to Casamance. While Ndom has not claimed a "pattern or practice" of persecution pursuant to 8 C.F.R. § 208.13(b)(2)(iii),[3] "the regulation leaves the standards governing non-pattern or practice cases [implicating persecution of groups of people] to be developed through case law." *Kotasz v. INS*, 31 F.3d 847, 853 (9th Cir.1994).

### A. Persecution

■ Evidence of physical harm is not required to establish persecution. *See Khup v. Ashcroft*, 376 F.3d 898, 903(9th Cir.2004); *Baballah v. Ashcroft*, 367 F.3d 1067, 1074 (9th Cir.2004). The cumulative effect of harms that might not individually amount to persecution may support an asylum claim. *See Baballah*, 367 F.3d at

1076. Here, the record evidence compels the conclusion that Ndom's treatment by the Senegalese armed forces constituted persecution.

After Ndom's second arrest, the police commissioner at the Ziguinchor station directly threatened Ndom that he was "taking a risk to die" and would face serious harm if he were rear-rested. Ndom understood the police commissioner to mean that Ndom would be "disappeared" if he were brought into the police station again.

The documentary evidence in the record, noted above, consistently describes extra-judicial killing and disappearance in Casamance generally, and Naguis in particular. It also contains evidence of a mass grave for victims of extra-judicial execution in Ziguinchor. This context underscores the severity of the police commissioner's threat to Ndom. We have "consistently held that death threats alone can constitute persecution." *Navas v. INS*, 217 F.3d 646, 658 (9th Cir.2000); *see also Khup*, 376 F.3d at 903.

■ Credible death threats are particularly compelling in establishing persecution when combined with other forms of mistreatment. *See id.; cf. Lim v. INS*, 224 F.3d 929, 936 (9th Cir.2000) (unfulfilled threats did not necessarily establish past persecution absent particular suffering or harm; "[n]either Lim nor his family was ever touched, robbed, imprisoned, forcibly

---

3. 8 C.F.R. § 208.13(b)(2)(iii) states that:

In evaluating whether the applicant has sustained the burden of proving that he or she has a well-founded fear of persecution, the asylum officer or immigration judge shall not require the applicant to provide evidence that there is a reasonable possibility he or she would be singled out individually for persecution if:

(A) The applicant establishes that there is a pattern or practice in his or her country of nationality or, if stateless, in his or her country of last habitual residence, of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(B) The applicant establishes his or her own inclusion in, and identification with, such group of persons such that his or her fear of persecution upon return is reasonable.

recruited, detained, interrogated, trespassed upon, or even closely confronted"). Aside from being threatened, Ndom suffered two instances of arrest and detention by the Senegalese authorities. Although brief detentions, without more, can be insufficient to establish persecution, *see, e.g., Al-Saher v. INS*, 268 F.3d 1143, 1146 (9th Cir.2001) (five to six days); *Mendez-Efrain v. INS*, 813 F.2d 279, 282–83 (9th Cir.1987) (four days), Ndom was detained for a total of twenty-five days, including nineteen consecutive days.

▮ Moreover, the nature of Ndom's detentions contributes strongly to our conclusion that the record compels a finding of persecution. Ndom was held in dark, crowded cells without formal charges and without any indication of when he would be released. He was shackled in cuffs that prevented him from straightening his legs, and was forced to urinate in his clothes because there were no toilets in the cell. Combined with the police commissioner's death threats, these circumstances satisfy our definition of persecution as requiring "the infliction of suffering or harm . . . in a way regarded as offensive." *See Desir v. Ilchert*, 840 F.2d 723, 727 (9th Cir.1988) (quotation marks and citation omitted).

## B. "On Account of" Imputed Political Opinion

### i. *General Principles*

▮ Ndom must also show that the persecution he suffered was, at least in part, on account of a protected ground. "[P]ersecutory conduct may have more than one motive, and so long as one motive is one of the statutorily enumerated grounds, the requirements have been satisfied." *Singh v. Ilchert*, 63 F.3d 1501, 1509 (9th Cir.1995). Ndom can establish persecution based on a political opinion imputed to him by his persecutors, regard-

less of whether or not he actually holds that opinion. *See Mejia*, 298 F.3d at 877.

▮ The IJ concluded that politics were not responsible for Ndom's arrests because "when [Ndom] was arrested, other people were arrested at or about the same time, for the same reasons; namely, confrontations in the area, immediately prior to the arrest, for which people were indiscriminately arrested, because of actual or suspected involvement in 'rebellious manifestations.'" This analysis improperly truncated the requisite inquiry. True, the existence of civil war or civil strife in an applicant's country of origin, by itself, does not establish eligibility for asylum. *See, e.g., Limsico v. INS*, 951 F.2d 210, 212 (9th Cir.1991); *Martinez–Romero v. INS*, 692 F.2d 595, 595–96 (9th Cir.1982). At the same time, the existence of civil strife does not alter our normal approach to determining refugee status or make a particular asylum claim less compelling. "We have cautioned that the difficulty of determining motive in situations of general civil unrest should not . . . diminish the protections of asylum for persons who have been punished because of their actual or imputed political views." *Garcia–Martinez v. Ashcroft*, 371 F.3d 1066, 1073(9th Cir.2004) (quotation marks and citation omitted). Thus, widespread violence and detention cannot override record evidence that persecution occurred at least in part as a result of an applicant's protected status.

In *Baballah*, for example, we required analysis of specific instances of persecution that took place within a context of general violence between Jews and Arabs in Israel, stating that "[t]he IJ's suggestion that the threats and attacks experienced by Baballah and his family cannot be considered persecution because of generally dangerous conditions is at odds with our case law." 367 F.3d at 1077. Similarly, in *Knezevic v. Ashcroft*, 367 F.3d 1206 (9th

Cir.2004), we determined that the IJ had "miss[ed] the critical distinction between persons displaced by the inevitable ravages of war ... and those fleeing from hostile forces motivated by a desire to kill each and every member of that group...." *Id.* at 1211. The latter, we emphasized, is clearly persecution "on account of" a protected ground. *Id.* at 1212. Where we have found no persecution despite civil strife or random violence, the reason has been the applicant's failure to establish that his or her persecutor was motivated by one of the five statutory grounds. *See, e.g., Rostomian v. INS,* 210 F.3d 1088, 1089 (9th Cir.2000) ("[Petitioners] did not establish that the attack was anything more than an act of random violence during a period of significant strife."); *Gaya Prasad v. INS,* 101 F.3d 614, 617 (9th Cir.1996) ("A necessary element of a claim of past persecution is that the alien must show he was persecuted, because of his race, religion, nationality, membership in a particular social group, or political opinion. It is not sufficient to show he was merely subject to the general dangers attending a civil war of domestic unrest." (quotation marks and citations omitted)).

In support of his finding of civil strife in this case, the IJ cited the United Nations High Commissioner on Refugees' ("UNHCR"), *Handbook on Procedures and Criteria for Determining Refugee Status,* U.N. Doc. HCR/1P/4/Eng/ REV.2, para. 164 (ed.1992) (1979), for the proposition that "[p]ersons compelled to leave their country of origin as a result of international or national armed conflicts are not normally considered refugees under the 1951 [Refugee] Convention or the 1967 Protocol [Relating to the Status of Refugees]." [4] It is true that individuals who depart their countries of origin *solely* as a result of armed conflict that has not implicated a protected ground will, consistent with this commentary, generally not be eligible for asylum. Nevertheless, subsequent UNHCR interpretations have stressed that although civil strife does not qualify an applicant as a refugee per se,

> in many situations, persons fleeing conflict may also be fleeing a well-founded fear of persecution for Convention reasons. This is the case, for example, when a segment of the population is targeted by government or non-government forces due to their ethnic, religious or political affiliation. Persons fleeing or remaining outside a country for reasons pertinent to refugee status qualify as Convention refugees, regardless of whether those grounds have arisen during conflict.

UNHCR Executive Comm., *Note on International Protection,* U.N. GAOR 46th sess., para. 11, U.N. Doc. A/AC.96/850 (1995); *see also* UNHCR Executive Comm., *Note on International Protection,* U.N. GAOR, 49th sess., para. 4, U.N. Doc. A/AC.96/898 (1998) ("Persons displaced by war or conflict can legitimately fear persecution. War may well be the very instrument of persecution, the method chosen by the persecutors—whether part of the State apparatus or not—to repress or eliminate entire groups of people ....").

In certain contexts, moreover, the existence of civil strife supports a finding that claimed persecution was on account of a protected ground. If violence has its

---

4. The UNHCR Handbook is considered persuasive authority in interpreting the scope of refugee status under domestic asylum law. *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 439 n. 22, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) ("[T]he Handbook provides significant guidance in interpreting the Protocol, to which Congress sought to conform [in the Refugee Act of 1980]."); *Singh,* 63 F.3d at 1511.

roots in enmity based on a protected statutory ground, this state of affairs will bolster an asylum claim. An extreme example is ethnic cleansing. *See Knezevic,* 367 F.3d at 1212("A claim of past persecution is strengthened where the applicant proves that an invading army intends to ethnically cleanse the region of the applicant's ethnic group.").

Even in circumstances falling short of such barbarity, we are similarly more likely to find that particular instances of past persecution experienced by an applicant were inflicted on account of a protected ground where similar acts are regularly experienced by others who share the applicant's protected affiliation. *See, e.g., Chand v. INS,* 222 F.3d 1066, 1076(9th Cir.2000) ("[T]hat other Indian Fijians have faced persecution similar to the persecution Chand suffered strengthens, rather than weakens, his claim."); *Kotasz,* 31 F.3d at 854 ("[T]he existence of a group of persons similarly situated to [the petitioner] in some ways strengthens his claim by establishing that his case was part of a larger government tendency to detain and harass, rather than an isolated event.").

Past persecution inquiries are analytically distinct in this respect from those concerning a well-founded fear of future persecution. In making well-founded fear claims, "the petitioner cannot simply prove that there exists a generalized or random possibility of persecution in his native country; he must show that he is at particular risk—that his predicament is appreciably different from the dangers faced by [his] fellow citizens." *Kotasz,* 31 F.3d at 852(quotation marks and citation omitted). In *Kotasz,* the Hungarian government had detained and beaten the petitioner along with ten to twenty other anticommunist protesters on several occasions. 31 F.3d at 850. The BIA dismissed the petitioner's claims because "he was not

alone—not 'singled out'—as the subject of government abuse." *Id.* at 854. We rejected the BIA's reasoning, noting that although the petitioner had not been the sole subject of persecution, he was "personally targeted for government abuse, as were his fellow detainees." *Id.*

In this case, the INS argued that Ndom was not "singled out" for persecution, citing the numerous arrests of villagers. Yet, "[w]hile proof of particularized persecution is sometimes required to establish a well-founded fear of future persecution, *such proof of particularized persecution is not required to establish past persecution.*" *Knezevic,* 367 F.3d at 1211 (emphasis added). This distinction results from the requirement that an applicant establish a well-founded fear of persecution by proving that his or her fear is both objectively reasonable and subjectively genuine. *See Nagoulko v. INS,* 333 F.3d 1012, 1016 (9th Cir.2003). Establishing "particular risk" in that context contributes to demonstrating an objectively reasonable fear. With respect to claims of past persecution, however, requiring an applicant to show that the persecution he or she suffered was "appreciably different from the dangers faced by ... fellow citizens," *Kotasz,* 31 F.3d at 852 (internal quotation and citation omitted), would have a perverse effect: Petitioners whose governments inflict widespread human rights abuses on protected groups would be required to make a greater showing of past persecution than those from countries where human rights abuses are more narrowly targeted.

In sum, even in situations of widespread civil strife, "it is irrelevant whether one person, twenty persons, or a thousand persons were targeted or placed at risk," *id.* at 854, so long as there is a nexus to a protected ground.

ii. *Application to this Case*

■ Applying these standards, we are compelled to conclude that Ndom met his burden of providing "*some* evidence of motive, direct or circumstantial," and of demonstrating "the connection between the government's actions and his membership in a protected group." *Baballah*, 367 F.3d at 1077 (quotation marks, alteration and citations omitted). Ndom does not claim that he fled Casamance because of an undifferentiated fear of the active hostilities between the Senegalese government and the MFDC. Rather, Ndom testified about instances of persecution in which the Senegalese armed forces targeted him and "has shown credible, nonspeculative insight into the motivation of his persecutors." *Id.*

■ Ndom testified that mass arrests of Naguis residents regularly follow the outbreak of fighting between the government and the MFDC in the surrounding area. He stated that when he was arrested and detained for the first time, he was individually accused of supporting the MFDC, and ordered to sign a confession form stating that he participated in a "rebellious manifestation." That Ndom was arrested the second time along with many other residents of Naguis does not diminish the fact that a political opinion—support for the MFDC—was imputed to him by the Senegalese authorities on that occasion as well.[5] *See Sangha v. INS*, 103 F.3d 1482, 1489 (9th Cir.1997) ("In establishing an imputed political opinion, [we consider] ... the political views the persecutor rightly or in error attributes to his victims."). Further, even if the government authorities' motivation for detaining and mistreating Ndom was partially for reasons of security, persecution "in the absence of any legitimate criminal prosecution, conducted at least in part on account of political opinion, provides a proper basis for asylum and withholding of deportation, even if the [persecution[6]] served intelligence gathering purposes." *Ratnam v. INS*, 154 F.3d 990, 996 (9th Cir.1998); *see also Blanco–Lopez v. INS*, 858 F.2d 531, 534 (9th Cir.1988).

In short, the IJ failed properly to analyze the instances of persecution described by Ndom, apparently in light of his belief that they were a product of undifferentiat-

---

5. During the INS's cross-examination of Ndom, the following exchange took place. Notably, although Ndom's native language is French, he testified before the IJ in English without the aid of a translator.

> INS: Did the soldier ever make any mention to you about your previous activities with the MFDC at all?
> NDOM: They said you were the second time, but the first time, you know, the secret service they told me you have a record, no. You have a record here.
> IJ: You didn't listen to the question, or if you listened to it, you didn't understand it. So I want to repeat it? [ ... ]
> INS: During your second arrest in 1995, did the soldier make a statement to you about your activities with the MFDC?
> NDOM: No, not, personally, they just told me we're questioning me because you participate in a rebellious manifestation.

As already described, it is clear that the government authorities linked Ndom to the MFDC at the time of his first arrest. When Ndom was arrested for the second time, the arresting soldiers explicitly connected this arrest with his previous arrest, and he was interrogated by the same police commissioner. It is thus clear that the government authorities continued to impute an oppositional political opinion to Ndom.

6. We recognize that *Ratnam* used the term "torture," but nothing in *Ratnam* suggests that its holding applies solely to persecution that rises to the level of torture, as defined, for example, in the United Nations Convention Against Torture. Indeed, in the sentence immediately preceding the one quoted, *Ratnam* refers to "persecutory conduct," 154 F.3d at 996, confirming that "torture" was used in *Ratnam* as an example of persecution, rather than as a distinct category.

ed civil strife. On this record, we are compelled to conclude that Ndom's persecution was at least in part on account of imputed political opinion.

## II

■ Our determination that Ndom's treatment by the Senegalese armed forces constituted persecution on account of an imputed political opinion[7] entitles him to a presumption of a well-founded fear of persecution. *See Korablina v. INS,* 158 F.3d 1038, 1043 (9th Cir. 1998); 8 C.F.R. § 208.16(b)(1)(i). The INS made no arguments concerning changed country conditions to the IJ or the BIA, and presented no documentary evidence for that purpose. "In these circumstances, to provide the INS with another opportunity to present evidence of changed country conditions, when it twice had the chance, but failed to do so, would be exceptionally unfair." *Baballah,* 367 F.3d at 1078 n. 11.

In this situation, we are not required to remand for a determination of whether Ndom is eligible for asylum. *See id.* (citing *INS v. Ventura,* 537 U.S. 12, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curiam)). We hold that he is eligible for asylum. Because the decision to grant asylum is discretionary, however, we remand for a determination of whether Ndom should be granted asylum. *See id.;* 8 U.S.C. § 1158(b)(1).

7. Because we find that Ndom has established past persecution on the basis of imputed political opinion, we do not address his claim to asylum based on membership in a "particular social group."

8. Ndom also requests withholding of removal under Article 3 of the United Nations' Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). However, Ndom failed to exhaust this claim before the IJ or the BIA and we

■ Because Ndom has established past persecution on account of imputed political opinion, "a presumption arises that he is entitled to withholding of removal." *Baballah,* 367 F.3d at 1079. The INS has not rebutted this presumption. We therefore conclude that it is " 'more likely than not that [Ndom] would be subject to persecution' " if returned to Senegal. *See id.* (quoting *INS v. Stevic,* 467 U.S. 407, 424, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984)). Ndom is therefore entitled to withholding of removal. *Id.*[8]

**PETITION FOR REVIEW GRANTED in part; REMANDED.**

therefore lack jurisdiction to consider it. *See Barron v. Ashcroft,* 358 F.3d 674, 678 (9th Cir.2004) (exhaustion is mandatory and jurisdictional). Ndom's contention that he did not raise a CAT claim because his Notice to Appear was issued prior to his eligibility for relief under the CAT is unavailing. Ndom's proceedings before the IJ took place between late 1998 and early 2001, and he could have raised a CAT claim at any point after March 22, 1999. *See* 8 C.F.R. § 208.18(b)(1).