# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SOLIMAN FAHIM FARID MORGAN,
                    *Petitioner,*

            v.

MICHAEL B. MUKASEY, Attorney
General,
                    *Respondent.*

No. 05-70590

Agency No.
A95-294-903

---

SOLIMAN FAHIM FARID MORGAN;
MIRIAM RASHED SHAROUBIM
MAKAR; ARSANY MORGAN; INGY
MORGAN; MINA MORGAN,
                    *Petitioners,*

            v.

MICHAEL B. MUKASEY, Attorney
General,
                    *Respondent.*

No. 05-73115

Agency Nos.
A95-294-903
A95-294-904
A95-294-905
A95-294-906
A95-294-907

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
May 7, 2008—Pasadena, California

Filed June 25, 2008

Before: John T. Noonan, William A. Fletcher, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Noonan

7425

## COUNSEL

Natalia A. Nekrasova, Encino, California, for the petitioners.

Gary Newkirk, Assistant United States Attorney, Washington, D.C., for the respondent.

**OPINION**

NOONAN, Circuit Judge:

Soliman Fahim Farid Morgan (Morgan); his wife, Miriam Rashed Sharoubim Makar (Miriam); and their three children, Arsany, Ingy and Mina (collectively, Petitioners) seek review of two decisions of the Board of Immigration Appeals (BIA) denying them asylum and other relief. Holding that the BIA's two decisions are marred by errors of law, we grant the petitions and remand.

FACTS

We recite the facts as presented in Morgan's testimony. Morgan was born November 6, 1962 in Kafr-El-Dawar, Egypt. He and his family are members of the Coptic Orthodox Church, an ancient branch of Christianity. They come from Egypt, long a home of Coptic Christians, who compose roughly nine percent of the population of a largely Muslim nation. *See* CIA World Fact Book (Egypt) at https://www.cia.gov/library/publications/the-world factbook/ geos/eg.html. Morgan testified to the following incidents in which he had experienced the hostility from those he termed "extremists"—Muslim fundamentalists —who, in these instances, were not restrained by the government:

In 1988, Morgan opened a retail store. On the store's opening day, it remained open during Muslim prayers. Islamic fundamentalists attacked it, destroyed its merchandise and furniture, and set it on fire. The fundamentalists threatened to kill Morgan if he continued to do business. Morgan reported the attack to the fire department, which refused to investigate or provide a report of the incident for insurance purposes.

In 1995, a group of Muslim extremists attacked a jewelry store belonging to Morgan's cousin, Refaat, and severely beat Refaat. Morgan took Refaat to the hospital. They were shot at

as they drove away. Once Morgan and Refaat had left, the extremists beat Refaat's wife and sprayed acid in her face. They kidnaped, raped, and blinded Refaat's daughter. When Morgan and Refaat later informed the police, the police insulted them and their religious beliefs.

On May 5, 1997, Morgan was arrested and falsely accused of raping Hoda, the daughter of a Muslim client. The police said they would drop the charges if Morgan converted to Islam and married Hoda. Morgan refused, saying "I would rather die like many Christians did before me, than leave my religion and convert." Morgan was then beaten and gang raped by three men as a police officer looked on. Before raping him, the men tore off a gold cross that he wore around his neck, called it "devil jewelry," and stomped on it.

Morgan's family hired a famous Muslim attorney, Abdel-Halim Farid, to defend him from the rape charge. With his help Morgan was proved innocent as the lawyer obtained hospital records establishing that Morgan was recovering from hernia surgery at the time Hoda was allegedly raped.

On October 13, 1998, Islamic extremists kidnaped Morgan's wife Miriam and two of his children, Arsany and Ingy. They demanded that Morgan's father deed a parcel of land he owned adjacent to the Coptic parish church for the building of a mosque. The extremists also demanded that Miriam convert to Islam. When she refused, they gang raped her in front of her children. Miriam and the children were released after Morgan's father transferred title to Farid, the Muslim attorney who represented Morgan in the rape case and who now acted as a go-between. A government-authorized mosque and madrassa now stand next to the Coptic church.

In December 1999, the wife of Miriam's cousin was kidnaped, raped, and forced to convert to Islam in a public celebration conducted under police protection. The people who

did this also threatened Morgan's family and wife with the same sort of forced conversion.

In October 2000, a government tax assessor told Morgan that he knew about Morgan's refusal to convert to Islam and his alleged rape of Hoda. He assessed him taxes of 77,000 Egyptian pounds (about 14,125 USD). Morgan usually paid between 3,000 to 4,000 Egyptian pounds each year. The assessor said that he would assess normal taxes if Morgan converted. On March 7, 2001, Morgan obtained relief from this assessment in court. As Morgan and his father were leaving the court, Islamic extremists shot at them. His father was shot in his lower right leg.

## PROCEEDINGS

On March 16, 2001, Morgan and his family entered the United States on tourist visas. On April 5, 2002, the government charged them with overstaying their visas. On June 20, 2002, they conceded their removability and asked for asylum and other relief.

Between June 20, 2002 and March 17, 2003, six evidentiary hearings were held by the immigration judge. Morgan and Miriam testified. An affidavit from the court of Kafr-El-Dawar testified to Morgan's 1997 acquittal of the rape of Hoda.

The immigration judge denied Arsany and Ingy, Morgan's teenage children, the ability to testify on the grounds that they were not on the witness list submitted in advance of trial and that he did not want to put them in "the untenable position of coming into court to advance their parents' specious claims." Even before Morgan was cross-examined by the government, the immigration judge had stated that Morgan had "severe credibility problems" and suggested that he withdraw his petition if the government would give him voluntary departure. At the conclusion of the hearing, the immigration judge found

both Morgan and Miriam not believable and indeed that they had given "false testimony" for the purpose of obtaining an immigration benefit. He gave reasons for this conclusion. He denied them, but not their children, voluntary departure. The immigration judge did not determine whether Morgan's allegations, if assumed to be credible, made him eligible for asylum, withholding of removal, or protection under the Convention Against Torture.

Petitioners appealed to the BIA. They were able to submit additional documents: an evaluation of Miriam by a marriage and family therapist, licensed in California since 1981 and a member of the Program for Torture Victims, founded in Los Angeles in 1980 and funded in part by the United Nations and by the United States Office of Refugee Resettlement. The therapist found Miriam suffering from Post-Trauma Stress Disorder (PTSD) based on her kidnaping and rape. The therapist made a professional assessment of Miriam's credibility and found her fully credible. Psychological reports on Arsany and Ingy by another psychologist found each of them to show many of the symptoms of PTSD related to their memories of their kidnaping and the rape of their mother. All three psychological reports ended with specific reference to the ongoing deportation proceedings.

On August 2, 2004, the BIA issued its decision dismissing the appeal in a written opinion. It began by stating that the petitioners had "not shown that the Immigration Judge's adverse credibility determination is clearly erroneous." For example, the BIA stated, the immigration judge had noted that Morgan testified inconsistently about the shooting while driving his cousin to the hospital; that he inconsistently testified about the treatment of Miriam by a doctor after she was released from the kidnapers; and that he testified inconsistently about being threatened by an Egyptian prosecutor. Miriam, the BIA said, had testified inconsistently about how she was kidnaped. "These discrepancies," the BIA concluded, "are sufficiently major, material, and unexplained to support

the Immigration Judge's adverse credibility determination." The testimony of the two children would have been "cumulative" and not "remedied the discrepancies discussed above." In a single sentence the BIA dealt with the psychological reports: they did not "sufficiently explain the inconsistent testimony" to warrant remand.

The petitioners moved to reopen. On January 11, 2005, the motion was denied, the BIA noting that evidence submitted with it "fails to overcome the Immigration Judge's adverse credibility determination."

Morgan, Miriam, and their children petition this court for review.

## ANALYSIS

*The matter under review*. If the BIA issues a written opinion, it is that opinion which is under review. *Hosseini v. Gonzales*, 471 F.3d 953, 957 (9th Cir. 2006). But there is an ambiguity in this opinion. It appears to adopt the immigration judge's "credibility determination" both in the opinion itself, which proceeds by giving examples from it, and by the denial of the motion to reopen which speaks as though that determination was controlling. The government, briefing this appeal, has argued that the BIA's examples drawn from the immigration judge's determination are merely illustrative and that the immigration judge's determination is what is under review. We accept that argument and so review that determination.

*The components of the credibility determination*. This court reviews factual determinations, including credibility determinations, for substantial evidence. *Chebchoub v. INS*, 257 F.3d 1038, 1042 (9th Cir. 2001). Under this standard, we reverse a factual determination only if "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). An adverse credibility finding must be supported by "specific and cogent reasons." *Preet Kaur v. Gon-*

*zales*, 418 F.3d 1061, 1064 (9th Cir. 2005). Those reasons "must be substantial and bear a legitimate nexus to the finding" of incredibility. *Marcos v. Gonzales*, 410 F.3d 1112, 1117 (9th Cir. 2005). Inconsistencies that are "minor" or that "do not go to the heart of an applicant's claim[s]" are insufficient by themselves to support an adverse credibility finding. *Preet Kaur*, 418 F.3d at 1064.

[1] Substantial evidence does not support the incredibility determination in this case because the components of that determination are neither substantial nor go to the heart of Morgan's claims of past persecution. Morgan also adequately explained the minor discrepancies between his written declaration and his testimony. We proceed to discuss each of the eight grounds supporting the immigration judge's incredibility finding.

*The drive to the hospital.* From the transcript apropos of Morgan driving his cousin to the hospital, Q is the immigration judge, A is Morgan:

> Q. And what was the, what was the drive like to the hospital?
>
> A. During that time the roads are usually empty because it was during the month of Ramadan and during the time when people are no longer fasting. They can eat.
>
> Q. So, did, was there any difficulty in driving to the hospital?
>
> A. No.
>
> Q. You're sure about that?
>
> A. Yes.

Q. All right. Sir, your statement says and I'm quoting, "I was nearly killed along with him by bullets flying around us while driving him to the hospital."

A. That was in the area as we were leaving the place. Nothing came in our bodies. They came in the car.

Q. Okay. I just asked you if there was any difficulty in driving to the hospital. You indicated there was not.

A. The difficulty was in the, in our area.

Q. And what was the difficulty, sir?

A. The people that shot, they tried to shoot at us, shoot, stop our car so that they would not allow us to get out of our area.

Q. And is it correct, sir, that you were nearly killed by flying bullets?

A. I mean, the bullets were flying but, I wasn't shot on that day.

Q. Well, I'm reading from your statement, sir. It says you were nearly killed. That's your statement, not mine.

A. Yeah, because within a second I could have been shot. The fear that we had, I mean, one just wants to get out of the city.

Q. Okay. And a moment ago when I asked you if there was any problem in driving to the hospital, you

said there was not. The reason you didn't mention the shooting is why, sir?

A. After we left our area, there were no problems, but the problems were maybe within those five, 10 minutes within our area.

**[2]** It is difficult to determine any inconsistency. Morgan explains his testimony as the immigration judge questions him: as he drove from the area where his cousin had been attacked, life-threatening bullets flew about him fired by the mob; there were no difficulties on the rest of the drive to the hospital. All of the facts cannot be tumbled out in one breath. Testifying takes time. Development by details is the ordinary way.

*The gang rape of Morgan*. The immigration judge stated: "The male respondent claimed to have been raped repeatedly and mercilessly by male guards, but would also have the Court believe that this mistreatment required less medical attention than a hernia operation." This conclusion was based on the following interrogation by the immigration judge.

JUDGE FOR THE RECORD

So, I don't understand your answer as to why after you were a victim of sexual assault, you would not seek medical attention.

JUDGE TO MR. MORGAN

Q. What is the reason that you did not seek such treatment?

A. We, we Christians like to go to private doctors outside, in particular to a hospital named Victoria (phonetic sp.). All the Christians in Kafr El Dawar go there because this hospital is prepared by our

churches and with our love and nobody there is going to hurt us.

If you have a small wound or something, you will go to anything close to you. Nobody goes to public hospital at all.

Q. Do you mean you did not seek medical attention after you were sexually assaulted in prison?

A. I was treated at a doctor.

Q. Where?

A. In Kafr El Dawar, a Christian in town.

Q. So, then, you did receive medical treatment after you were sexually assaulted from a doctor. Is that what you're saying?

A. Yeah, he gave me tranquilizers and, I mean, my situation was really bad. Emotionally I was very bad and, and there was blood in the anus. I mean, I don't want to get into details. It's really bad.

Q. How long was it after you were released that you saw this doctor?

A. Approximately the same day, my father took me the same day.

[3] The immigration judge, showing singular insensitivity to Morgan's suffering, has speculated as to what Morgan's condition required and ignored his consistent statements as to the medical attention he received from a family doctor.

*The prosecutor's threat.* The immigration judge cites Morgan's written declaration that after his acquittal of rape, "the

prosecutor told me to my face" that he wouldn't escape again. Testifying in court, Morgan stated this threat was delivered to his attorney. The immigration judge finds an inconsistency.

The immigration judge has misstated Morgan's declaration, which reads, "the prosecutor told me to my face that you are set free this time, we will see . . . followed by murmured words I did not understand in a low level voice, but in a threatening way." Testifying, Morgan (A) had this exchange with the immigration judge (Q):

> Q. What do you — do you mean that you learned of the prosecutor's threat through your attorney?
>
> A. Yes.
>
> Q. Did you speak with the prosecutor after the case was over?
>
> A. No.
>
> Q. You're sure about that, sir?
>
> A. Yes.
>
> Q. All right. Sir, your statement says, "At the time of my release, the prosecutor told me to my face that, 'You're set free this time, but we will see.' " Now sir, it sounds to me from that statement that you were indicating that you did speak with the prosecutor directly.
>
> A. I could hear something, but the attorney came and attested to what I heard.
>
> Q. So, it's not as your statement provides, sir, that you were told these things to your face by the prosecutor?

A. I was behind bars and he said it in front of all the people. He said five, six words and I heard one of them and my attorney assured me that this is what he said because he was close to him.

**[4]** The difference between the declaration and Morgan's testimony is impalpable.

*The kidnaping of Miriam.* Morgan's declaration stated that "three men jumped from the vehicle" and that they kidnaped Miriam and the children. Miriam testified, "We were walking like this and suddenly three came out. They carried us and put us in the car."

On cross-examination:

Government lawyer: How many actually grabbed you? You said two earlier.

Miriam: They were three. All of them were standing outside and, when we approached, the driver got behind the wheel to get himself ready, and the two grabbed us and put us in the van.

Government lawyer: But your application says that three men jumped from the vehicle.

Miriam: I don't know. This is what I recall.

**[5]** There is a difference between men jumping out of the car and men waiting. Recollecting an event that took place seven years earlier, Miriam admitted an inability to be exact about what was a trivial element of her traumatic experience.

**[6]** *Telephone conversations with the kidnapers.* The immigration judge observed that Morgan's written declaration describes three phone calls with his wife when she was in the hands of the kidnapers. Miriam testified that she spoke on the

phone only twice. The difference, significant in the eyes of the immigration judge, is immaterial.

*Miriam's medical treatment.* Morgan's written declaration stated that after his wife's release from the kidnapers, "we stopped at home briefly and then I took them to a doctor." At the hearing the immigration judge questioned Morgan as follows:

> Q. And Dr. Sultan was at your home when your wife got back. Is that right?
>
> A. At the last session you did not believe me because the treatment took place at the clinic, but I'm explaining to you like this because I want to get you to the truth because I realize last time you were not believing me.
>
> The doctor was at home but, then he continued my wife's treatment in the clinic. The last time you asked me, where she was treated I told you the clinic but, in the case I did not write the details exactly.
>
> Q. I noticed that, sir.

JUDGE FOR THE RECORD

> Now, again, this is my question.

JUDGE TO MR. MORGAN

> Q. Was Dr. Sultan at your house when your wife came back?
>
> A. Yes.
>
> Q. And one of the many things that I don't understand about your statement, sir is that it says, "We

stopped at home briefly and then, I took them to a doctor who is a friend of mine."

Do you see how that's different from your statement that Dr. Sultan was at your home when your wife got back?

A. This doctor delivered my wife's three kids and we've been dealing with him for 15 years now. When you deal with a doctor for 15 years, he's bound to be a friend. That's something normal. It's a must.

**[7]** Morgan testified consistently. He returned home with his wife. The family doctor was waiting for them. The doctor took Miriam to the clinic.

**[8]** *Morgan's father's threat*. Morgan testified that his own father had threatened to kill him if he converted to Islam. The immigration judge noted as an inconsistency that Morgan had not mentioned this fact in his declaration. Morgan said he'd forgotten it. It's very hard to see what bearing his father's emotions about conversion to Islam had on Morgan's asylum claims. He was not seeking asylum from his father.

**[9]** *Visiting the United States*. The immigration judge was skeptical that Morgan would have visited the United States before bringing his family if the entire family had indeed suffered as he said. The immigration judge made no allowance for the caution with which an immigrant might approach a new land nor did the immigration judge note that Morgan himself was the principal target of the fundamentalists.

It is understandable that a judge confronted with the raw facts of the ordeal of the Morgan family might not want to believe that any human beings could behave like their kidnapers and rapists. The ugliness —the horror —of their story is not, however, a reason for rejecting it. For ethnic, political, or

religious reasons people have behaved brutally to others help-less to fight back. The story of fundamentalist Islam and the Copts is an old story. Morgan's particular experience of it could not be evaluated except by a mind open to all the evidence.

In some legal systems, such as that of France, the magistrate-judge has duties of investigation and presentation of evidence. These duties verge on what we would consider prosecutorial. In our legal system the judge is not an investigator, still less is he a prosecutor. An American administrative law officer who bears the noble name "judge" is expected to conform to the American ideal of a judge — dispassionate, unbiased, ready to hear each side equally.

Our deference to the findings of fact of a trial judge are not due only to his vantage point in observing the actors in the trial. *See Mendoza v. Manimbao v. Ashcroft*, 329 F.3d 655, 661 (9th Cir. 2003). Our deference also assumes that the judge is acting as our system prescribes, that he is not acting as a French magistrate-judge, still less as a prosecutor. If he were, the basis for deference is destroyed. We would be compelled to scrutinize his findings with the same independence with which we examine any prosecutorial assertion. Such a judge, like any prosecutor, we would assume to be acting in good faith to promote the purposes of the law. But such a judge would not be an impartial fact-finder whose findings control our judgment. We do not need to reach that degree of scrutiny here.

**[10]** Viewing all the evidence in its context, the immigration judge's negative credibility determination is fatally marred by the errors we have noted. The judgment of the BIA, dependent on this determination, suffers the same defects. We reverse the adverse credibility finding and remand for a determination as to whether Morgan is eligible for asylum, withholding of removal, or protection under the Convention Against Torture. *See INS v. Ventura*, 537 U.S. 12,

16 (2002) (holding that "a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands").

Other errors of law infect the decision of the BIA in addition to its adoption of the credibility determination of the immigration judge. We address them in turn.

**[11]** *The denial of due process in the exclusion of two witnesses*. The immigration judge committed an error of law in prejudging what testimony Arsany and Ingy would give. *Manjit Kaur v. Ashcroft*, 388 F.3d 734, 737 (9th Cir. 2004). That the children were not on the pretrial witness list was not a reason for their exclusion once their mother's credibility was put in doubt and they were in a position to corroborate her. Their exclusion was injurious to her case, to Morgan's case, and to their own derivative case. The reasons advanced by the BIA for approving the exclusion are entirely inadequate. The testimony of percipient witnesses when an issue is in doubt can remove the doubt; such testimony is far from cumulative. The immigration judge and the BIA denied Morgan, Miriam, Arsany, and Ingy the right to the fair hearing that the constitution guarantees every person within the jurisdiction of the United States.

**[12]** *The brush-off of the psychological reports*. The single sentence of the BIA devoted to the psychological reports reflects no comprehension of their content or their bearing on a central issue, the kidnaping and rape of Miriam. Failure to consider the evidence before it is not such a flagrant violation of due process as the exclusion of percipient witnesses, but it is another error of law invalidating the decision of the BIA.

*Other matters*. Morgan also asserts that the BIA erred by conflating the burden of proof for asylum with that required for protection under the Convention Against Torture and that the BIA abused its discretion in denying Morgan's motion to reopen proceedings based on new evidence of changed coun-

try conditions. Because we are reversing the credibility finding and remanding for a reconsideration of Morgan's eligibility for relief, we do not reach these issues.

*The government's loss of the record.* The government disclosed at oral argument that it had lost the record and had not asked the clerk of this court to supply an additional copy of the record, which we possessed. The loss was unexplained. The record was not seen by the attorney assigned only two weeks earlier to argue the case before us. The loss was disclosed to us only as we asked about references to the record. We do not aim to criticize the government counsel who delivered its message, but rather to critique the government's system of organization and prosecution. The government could not persuasively present its case without recourse to the record that was not in its hands at or shortly before argument.

**[13]** The government is disabled from proceeding further with this case until it finds the record or secures a copy from us after making some effort at explaining how the government could and did lose the record.

## CONCLUSION

For the reasons stated, the petitions are GRANTED and the case REMANDED for proceedings consistent with this opinion. Given the involvement of the immigration judge in the case, it would be appropriate to assign it to a different immigration judge.