**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MORIS ALFREDO QUIROZ PARADA, *Petitioner*, | No. 13-73967 |
| v. | Agency No. A072-525-513 |
| JEFFERSON B. SESSIONS III, Attorney General, *Respondent*. | OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted November 14, 2017
San Francisco, California

Filed August 29, 2018

Before: Sidney R. Thomas, Chief Judge, Richard A. Paez,
Circuit Judge, and Timothy J. Savage,* District Judge.

Opinion by Judge Paez

---

*The Honorable Timothy J. Savage, United States District Judge for
the Eastern District of Pennsylvania, sitting by designation.

## SUMMARY[**]

### Immigration

The panel granted Moris Alfredo Quiroz Parada's petition for review of the Board of Immigration Appeals' denial of asylum, withholding of removal, and protection under the Convention Against Torture, in a case in which Quiroz Parada, a citizen of El Salvador, sought relief after he and his family were the victims of threats, home invasions, beatings, and killings at the hands of Frente Farabundo Martí para la Liberación Nacional guerillas.

The panel held that the record compelled a finding of past persecution. The panel explained that the Board mischaracterized what Quiroz Parada endured as simply threats against his family and attempts to recruit him, and ignored, among other evidence, his brother's assassination, the murder of his neighbor as a result of Quiroz Parada's own family being targeted, his experience being captured and beaten to the point of unconsciousness, repeated forced home invasions, and specific death threats toward his family. The panel concluded that the harm Quiroz Parada and his family suffered rose to the level of past persecution.

Applying pre-REAL ID Act standards, the panel held that the harm Quiroz Parada suffered bore a nexus to a protected ground, as the FMLN guerillas were motivated, at least in part, by his family's government and military service. The panel noted that it was immaterial that the

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

FMLN's attempted conscription of Quiroz Parada would have served the dual goal of filling their ranks in order to carry on their war against the government and pursue their political objectives, because their additional goal of retaliating against the Quiroz Parada family was a protected ground.

The panel held that substantial evidence did not support the agency's determination that the government successfully rebutted the presumption of future persecution. The panel noted that by the time the IJ considered the country conditions information submitted into the record it was five years out of date, and predated the FMLN's rise to power in government. The panel explained that the government cannot meet its burden of rebutting the presumption by presenting evidence of the Salvadoran government's human rights record at a time when the government was run by a different political party, particularly when at the time of the IJ hearing it was run by the very same FMLN who persecuted the Quiroz Parada family. The panel joined the Second Circuit in holding that reliance on significantly or materially outdated country reports cannot suffice to rebut the presumption of future persecution.

The panel concluded that the agency erred as a matter of law in denying Quiroz Parada's application for CAT relief because it ignored pertinent evidence in the record and erred by construing the "government acquiescence" standard too narrowly. The panel explained that acquiescence does not require actual knowledge or willful acceptance of torture, and that awareness and willful blindness will suffice. The panel further explained that the acquiescence standard is met where the record demonstrates that public officials at any level, even if not at the federal level, would acquiesce in the torture the petitioner is likely to suffer, and that evidence

showing widespread corruption of public officials, as the record revealed in this case, can be highly probative on this point. The panel noted that the country conditions reports and exhibits submitted by Quiroz Parada indicate the acquiescence of the Salvadoran government, or at least parts of the Salvadoran government, in the rampant violence and murder perpetrated by the Mara Salvatrucha gang, at whose hands Quiroz Parada fears that he will be killed.

The panel remanded for reconsideration of his CAT claim, an exercise of discretion whether to grant asylum relief, and an appropriate order withholding Quiroz Parada's removal.

## COUNSEL

Christopher J. Stender (argued), Federal Immigration Counselors AZ PC, Phoenix, Arizona, for Petitioner.

Janette L. Allen (argued) and Laura Halliday Hickein, Trial Attorneys; Shelley R. Goad, Assistant Director; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

## OPINION

PAEZ, Circuit Judge:

Moris Alfredo Quiroz Parada fled his native El Salvador in 1991 at the age of seventeen after he and his family were the victims of threats, home invasions, beatings, and killings at the hands of Frente Farabundo Martí para la Liberación Nacional (FMLN) guerillas. Twenty-four years after he first applied for asylum, Quiroz Parada petitions for review of a decision of the Board of Immigration Appeals (BIA) affirming the denial of his application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). We conclude that the record compels a finding of past persecution, and that substantial evidence does not support the agency's determination that the government successfully rebutted the presumption of future persecution. We also conclude that the agency erred as a matter of law in denying Quiroz Parada's application for CAT relief. Accordingly, we grant the petition and hold that Quiroz Parada is eligible for asylum and entitled to withholding of removal, and remand for reconsideration of his CAT claim.

## I.

## A.

Quiroz Parada, a native and citizen of El Salvador, entered the United States without authorization on May 25, 1991 at the age of seventeen. Quiroz Parada has continuously resided in the United States for the last twenty-seven years, and currently lives in Arizona with his wife and three children, the latter of whom are United States citizens. He is the sole provider for his family.

During the Salvadoran civil war of the 1980s and early 1990s, Quiroz Parada and his family were subjected to threats, home invasions, beatings, and killings by FMLN guerillas.[1]   Quiroz Parada's family was targeted largely because of his brother's military service during the civil war, and potentially also because of his father's work as an assistant marshal, a role akin to a sheriff.   The FMLN apparently found out about the Quiroz Paradas' government connections because some of the family's neighbors were relatives of the guerillas.

In June 1989, FMLN guerillas sought out and murdered Quiroz Parada's brother while he was on leave from the military.   Following his brother's assassination, FMLN guerrillas broke into the Quiroz Parada family home on at least three occasions.   The guerillas sought to kill other members of the Quiroz Parada family, and, on one occasion, to kidnap Quiroz Parada with the apparent intent to forcibly conscript him.

The Quiroz Paradas knew the guerillas were specifically targeting their family largely because the FMLN guerillas would begin calling out their family's name upon entering the Quiroz Paradas' village.   Although the FMLN's announcements were terrifying, they at least gave the family enough time to hide in the family's well and thus avoid harm during the first several invasions.   On another occasion, however, the family did not hear the guerillas approaching in time to hide before the guerillas broke into their home. Quiroz Parada attempted to flee, but was struck by the

---

[1] Because Quiroz Parada "was found credible and his testimony is thus accepted as undisputed, the facts recounted here are derived from his testimony" and asylum application. *Baballah v. Ashcroft*, 367 F.3d 1067, 1071 n.1 (9th Cir. 2004).

guerillas, tied up, carried out of his home, and beaten; the guerillas apparently intended to forcibly conscript him. He was only able to escape because the army suddenly arrived at his village, which caused the guerillas to flee—but not before they beat Quiroz Parada, causing him to lose consciousness. Quiroz Parada testified that his family realized after this attack that they were being targeted because of his brother's military service.[2]

The FMLN guerillas' targeting of the Quiroz Parada family also led to collateral consequences for those around the family. On one occasion, a different group of FMLN guerillas than had committed the previous home invasions mistakenly entered the home of the Quiroz Paradas' neighbors instead. The guerillas kidnapped the neighbor's sons and, upon discovering they had kidnapped the wrong family's sons, returned and murdered the mother in anger over their mistake.[3]

Quiroz Parada fled to the United States in 1991 after these incidents, but his family members who remained in El

---

[2] The record is not entirely clear as to whether the Quiroz Parada family was targeted solely on the basis of Quiroz Parada's brother military service, or whether it was a combination of his brother's military service and his father's position as an assistant marshal. For example, the guerillas who kidnapped and beat Quiroz Parada apparently knew of his brother's military service, but were not aware of his father's status as an assistant marshal. We need not resolve this ambiguity, as our analysis would be the same either way.

[3] There is also some ambiguity in the record about whether the neighbor's mother was murdered as reprisal for wrongly leading the guerillas to believe they were kidnapping members of the Quiroz Parada family, or whether she was murdered because the guerillas believed her to be a member of the Quiroz Parada family. Whichever the guerillas' true motive, it is immaterial to our analysis.

Salvador continued to suffer harm even after the end of the civil war. In 2000, his father received a death threat from a former FMLN guerilla's son, who had become a Mara Salvatrucha (MS) gang member in the intervening years. This familial transition from FMLN guerilla to MS member was apparently common; Quiroz Parada's family members have told him that many sons of former FMLN guerillas are now part of the MS gang. These FMLN descendants have long memories: the MS member who threatened Quiroz Parada's father told him "You are going to die. Because your family was in the military and killed someone from my family. And one way or another you will die." Quiroz Parada's father was killed five years later in a suspicious hit-and-run, which Quiroz Parada believes to have been carried out by the MS member who threatened his father or one of his associates. The threats did not end with his father's death, either: Quiroz Parada's mother was forced to flee their family home after receiving threats from MS gang members whose fathers were FMLN guerillas.

Quiroz Parada's family members have warned him not to return to El Salvador because "history will repeat itself"—meaning that Quiroz Parada will face kidnapping or death at the hands of the MS gang members who are descendants of FMLN guerillas. As of Quiroz Parada's hearing before an immigration judge (IJ) in 2012, all of his siblings had fled El Salvador.[4]

---

[4] Prior to fleeing, two of his sisters and their families were threatened with murder and rape by MS members. It is unclear, however, whether these threats were connected to the Quiroz Paradas' government service during the civil war, or to one sister's status as a gang informant and the other's status as the mother of a police officer.

**B.**

Quiroz Parada applied for asylum[5] and withholding of removal on September 27, 1994. If he is removed to El Salvador, Quiroz Parada fears he will be persecuted on account of his family status and political opinion. The source of that feared persecution is twofold: the MS gang members seeking revenge on behalf of their FMLN guerilla parents, as well as the FMLN itself—despite the fact that the FMLN is currently a political party, rather than a violent revolutionary movement. Because the FMLN is now the ruling political party, Quiroz Parada does not believe he can safely reside in any part of the country without falling victim to retribution by the FMLN. Moreover, simply laying low is not an option: Quiroz Parada believes the FMLN will learn of his return to the country and have the ability to locate him because he no longer has any Salvadoran documentation and would thus be required to renew all of his documents upon arriving in El Salvador. Quiroz Parada also testified that he is opposed to the FMLN's "leftist wing" form of democracy and that he would feel compelled to speak out against the FMLN-run government's policies, which he fears would result in persecution by the government. While Quiroz Parada is aware that the civil war ended several decades ago, he does not believe that the Salvadoran government would prosecute former FMLN guerilas if "they murder people, or behave badly."[6]

---

[5] Because Quiroz Parada applied for asylum prior to the effective date of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, the one-year bar for asylum applications does not apply. *See* 8 U.S.C. § 1158(a)(2)(B); 8 C.F.R. § 1208.4(a).

[6] Regrettably, as with many critical pieces of his testimony, Quiroz Parada's explanation for why he does not believe in the Salvadoran

Thirteen years passed before the government took any action on Quiroz Parada's 1994 asylum application. In May 2007, a Department of Homeland Security (DHS) officer finally interviewed Quiroz Parada. On May 31, 2007, Quiroz Parada's asylum case was referred to an immigration judge; DHS simultaneously issued a notice to appear, charging him with removability under 8 U.S.C. § 1182(a)(6)(A)(I) for being present in the United States without being admitted or paroled. At a master calendar hearing in February 2008, an IJ sustained the charge of removability. Quiroz Parada requested relief in the form of asylum, withholding of removal, CAT protection, and cancellation of removal.

The delays for Quiroz Parada didn't end there: nearly five years passed between his February 2008 hearing and his merits hearing before an IJ in November 2012. The government submitted its hearing exhibits back in 2008, including a 2007 Department of State Country Report and a 2007 Department of State Profile on El Salvador. Yet for unknown reasons, the government did not update their exhibits during the years that passed between submission of their exhibits and the actual hearing—despite the fact that the country conditions reports were five years out of date by the time of the merits hearing.

Quiroz Parada, by contrast, submitted his exhibits approximately one week before the November 2012 hearing. In addition to a written statement describing his past persecution and fear of future persecution, Quiroz Parada submitted a number of other exhibits corroborating his

government's ability or willingness to prosecute former FMLN members who murder or otherwise attack their former enemies is transcribed as "[indiscernible] and [indiscernible]."

claims.  For example, he submitted a 2010 letter from his sister—written prior to her fleeing the country—imploring him to not return to El Salvador for any reason because of the risk that he will be kidnapped or killed by MS.  The letter explained that the "police do[] not help, and they even get killed," and warned that if he were to come back to the country, "history would repeat itself."  Another one of his sisters sent him a copy of a handwritten threat she received from MS members, which said they knew she "snitched on the barrio" and warned her that if she failed to leave the area by a particular date, her "daughters will suffer the consequences."   His exhibits also included several newspaper articles about the violence perpetrated by MS in Quiroz Parada's home region; these articles echoed a letter from the National Civil Police of El Salvador describing MS's crimes, the gang's pervasiveness in Quiroz Parada's home region, and how the rampant violence has forced many families to flee.

The long-awaited hearing in November 2012 did not begin on a promising note.  Prior to hearing any testimony from Quiroz Parada or argument from his attorney, the IJ conveyed his belief that Quiroz Parada's asylum claim "may be a lost cause."  Nonetheless, despite the IJ's significant skepticism, he allowed Quiroz Parada's attorney to present Quiroz Parada's case for asylum.  On February 8, 2013, the IJ issued a written decision denying Quiroz Parada's requests for asylum, withholding of removal, CAT protection, and cancellation of removal.  The IJ first found that Quiroz Parada was credible under both the pre-REAL ID Act and REAL ID Act standards.[7]   The IJ then

---

[7] Although the REAL ID Act governs Quiroz Parada's claim for cancellation of removal, it does not govern his claims currently on

determined that Quiroz Parada had not shown past persecution, but further concluded that even if he had, DHS had rebutted the presumption with evidence of changed country conditions. The IJ also found that Quiroz Parada had not shown an independent well-founded fear of future persecution. Because the IJ determined that Quiroz Parada had not established eligibility for asylum through either past persecution or a well-founded fear of future persecution, Quiroz Parada necessarily failed to meet the higher bar required to obtain withholding of removal. The IJ also rejected Quiroz Parada's claim for CAT relief.

Quiroz Parada appealed the IJ's decision to the BIA, which dismissed his appeal. In its decision, the BIA affirmed the IJ's determinations on Quiroz Parada's asylum, withholding, and CAT claims, including the IJ's alternative holding that even if Quiroz Parada had established past persecution, the government had rebutted the presumption of a well-founded fear of future persecution. The BIA denied relief to Quiroz Parada, but granted him voluntary departure. Quiroz Parada timely petitioned us for review.

## II.

We examine the BIA's "legal conclusions de novo and its factual findings for substantial evidence." *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1059 (9th Cir. 2017) (en banc) (citations omitted). Substantial evidence review means that we may only reverse the agency's determination where "the evidence compels a contrary conclusion from that adopted by the BIA." *Afriyie v. Holder*, 613 F.3d 924, 931 (9th Cir. 2010). While this standard is deferential,

---

appeal, which were filed prior to May 11, 2005. *See Joseph v. Holder*, 600 F.3d 1235, 1240 n.3 (9th Cir. 2010).

"deference does not mean blindness." *Nguyen v. Holder*, 763 F.3d 1022, 1029 (9th Cir. 2014) (quoting *Li v. Ashcroft*, 356 F.3d 1153, 1158 (9th Cir. 2004) (en banc)). "Where, as here, the BIA has reviewed the IJ's decision and incorporated portions of it as its own, we treat the incorporated parts of the IJ's decision as the BIA's." *Molina-Estrada v. INS*, 293 F.3d 1089, 1093 (9th Cir. 2002).

## III.

To be eligible for asylum, Quiroz Parada must establish that he is a refugee—namely, that he is unable or unwilling to return to El Salvador "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Melkonian v. Ashcroft*, 320 F.3d 1061, 1064 (9th Cir. 2003) (quoting 8 U.S.C. § 1101(a)(42)(A)). "The source of the persecution must be the government or forces that the government is unwilling or unable to control."[8] *Ahmed v. Keisler*, 504 F.3d 1183, 1191 (9th Cir. 2007). To be well-founded, an asylum applicant's "fear of persecution must be both subjectively genuine and objectively reasonable." *Sael v. Ashcroft*, 386 F.3d 922, 924 (9th Cir. 2004). "An applicant 'satisfies the subjective component by credibly testifying that [he] genuinely fears persecution.'" *Id.* (quoting *Mgoian v. INS*, 184 F.3d 1029, 1035 (9th Cir. 1999)). The objective component can be established in two different ways, one of which is to prove past persecution. *Id.* at 924–25. Past persecution "giv[es] rise to a rebuttable presumption that a well-founded fear of

---

[8] The parties have not disputed that Quiroz Parada's previous harms were inflicted by forces that the government was either unable or unwilling to control. *See Lopez v. Ashcroft*, 366 F.3d 799, 803 n.4 (9th Cir. 2004).

future persecution exists." *See Ladha v. INS*, 215 F.3d 889, 897 (9th Cir. 2000) (internal quotation marks and citation omitted), *overruled on other grounds by Abebe v. Mukasey*, 554 F.3d 1203, 1208 (9th Cir. 2009) (en banc).

## A.

We first conclude that substantial evidence does not support the BIA's determination that the harms Quiroz Parada previously suffered did not rise to the level of persecution. Our conclusion is largely driven by the fact that the BIA mischaracterized what Quiroz Parada endured as simply "threats against his family and attempt[s] to recruit him." This glib characterization ignores, among other evidence, his brother's assassination, the murder of his neighbor as a result of his own family being targeted, his experience being captured and beaten to the point of unconsciousness, repeated forced home invasions, and specific death threats toward his family.

It is clear that the harms Quiroz Parada and his family *actually* suffered—murder, physical assault, home invasions, and specific death threats—rise to the level of persecution under our precedent. It is, of course, "well established that physical violence is persecution under 8 U.S.C. § 1101(a)(42)(A)." *Li v. Holder*, 559 F.3d 1096, 1107 (9th Cir. 2009). Quiroz Parada was beaten into unconsciousness, which we have held is "clear[ly]" sufficient to show past persecution. *See Gafoor v. INS*, 231 F.3d 645, 650 (9th Cir. 2000) (holding it was "clear" that petitioner who had been kidnapped and beaten until bleeding and unconscious suffered persecution). Moreover, we have consistently held that petitioners whose family members have been murdered—particularly when the petitioners themselves have also suffered physical injury—have suffered persecution. *See, e.g.*, *Rios v. Ashcroft*, 287 F.3d

895, 900 (9th Cir. 2002) (holding that petitioner suffered persecution where guerillas had kidnapped and wounded her, attempted to kidnap her son, and murdered her husband and brother); *Salazar-Paucar v. INS*, 281 F.3d 1069, 1075 (9th Cir. 2002) ("[E]vidence of harm to Petitioner's family supports a finding of past persecution."). Thus, the BIA's threshold determination—that Quiroz Parada had not suffered "persecution"—is not supported by substantial evidence.

We next address whether the agency's determination on the issue of nexus—that is, whether Quiroz Parada's persecution was "on account of race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1101(a)(42)(A)—was supported by substantial evidence. Because the BIA's decision affirmed the IJ's overall findings on past persecution but did not specifically address the IJ's determination on nexus, we review the IJ's decision "as a guide to what lay behind the BIA's conclusion." *See Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1058 (9th Cir. 2006) (internal quotation marks and citation omitted); *see also Morgan v. Mukasey*, 529 F.3d 1202, 1206 (9th Cir. 2008).

For reasons that are difficult to ascertain, the IJ divided the harms Quiroz Parada and his family suffered into two categories: (1) "threats" against him and his family, which the IJ determined had a nexus to his brother's military service and possibly also to his father's position as a marshal, and (2) attempts to forcibly conscript Quiroz Parada via home invasions, which the IJ viewed as lacking a nexus to his family's government service. We conclude that the agency's decision that Quiroz Parada only established nexus for some of the harms he suffered is unsupported by substantial evidence.

Under pre-REAL ID Act law, where an asylum-seeker's testimony is deemed credible, direct, and specific, corroboration is not required to establish the facts to which the applicant testifies. *See Ladha*, 215 F.3d at 899–901. And under pre-REAL ID Act law, so long as the applicant produces evidence from which it is reasonable to believe that the persecutor's actions were motivated at least in part by a protected ground, the applicant is eligible for asylum. *See Borja v. INS*, 175 F.3d 732, 736–37 (9th Cir. 1999) (en banc).

Here, Quiroz Parada's credible testimony establishes that the persecution he and his family suffered was "on account of" his family's government and military service—which constitutes persecution on account of a protected ground in two ways. As we recently reiterated, "the family remains the quintessential particular social group." *Rios v. Lynch*, 807 F.3d 1123, 1128 (9th Cir. 2015). That is, an asylum-seeker who has suffered persecution "on account of th[eir] familial relationship" has suffered persecution by reason of membership in a particular social group. *Id.* (citation omitted). As Quiroz Parada testified without contradiction, FMLN members specifically sought out the "particular social group" of his family, even shouting the Quiroz Parada family name as the guerillas entered the family's village**.**

Quiroz Parada's persecution on account of his family's government service also amounts to persecution on account of imputed political opinion. In a similar case, we concluded that guerillas imputed a political opinion to the petitioner on account of her husband's and brother's service in the Guatemalan military. *See Rios*, 287 F.3d at 900–01. Likewise, in *Meza-Manay v. INS*, 139 F.3d 759 (9th Cir. 1998), we held that the petitioner's husband's work with a

Peruvian counter-insurgency police force caused Shining Path guerillas to impute a political opinion to the petitioner, separate and independent from her actual political views. *Id.* at 764; *see also Navas v. INS*, 217 F.3d 646, 657–61 (9th Cir. 2000) (holding that Salvadoran military imputed pro-guerilla political opinion to petitioner due to his aunt and uncle's political affiliations); *Lopez-Galarza v. INS*, 99 F.3d 954, 959–60 (9th Cir. 1996) (concluding that Sandinistas imputed political opinion to petitioner based on her family's ties to the former government); *Silaya v. Mukasey*, 524 F.3d 1066, 1070–71 (9th Cir. 2008) ("[E]vidence 'that the alleged persecutor acted because of a petitioner's family's political associations is sufficient' to satisfy the motive requirement." (alteration omitted) (quoting *Kebede v. Ashcroft*, 366 F.3d 808, 812 (9th Cir. 2004))).

Finally, we note that the agency made much of the attempted conscription of Quiroz Parada as a potential motivating factor behind the FMLN guerillas' invasions of the Quiroz Parada family home. It is true, of course, that conscription by a non-governmental group does not necessarily constitute persecution on account of a protected ground. *See, e.g.*, *Melkonian*, 320 F.3d at 1068 (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 482 (1992)) (explaining that under *Elias-Zacarias*, forced conscription does not always amount to persecution on account of a protected ground, but holding that petitioner who was targeted for forced conscription on account of his ethnicity and religion had been persecuted). But where, as here, there is uncontradicted evidence that the attempted forced conscription was on account of Quiroz Parada's family association and imputed political opinion based on his brother's military service—both protected grounds—that attempted conscription is persecution within the meaning of our asylum laws. *See id.* We reiterate that because Quiroz Parada's claim is governed

by pre-REAL ID Act law, he need only demonstrate that his persecutors were motivated in part by a protected ground—which he has amply done. *See Borja*, 175 F.3d at 736–37; *Navas*, 217 F.3d at 661. Thus, it is immaterial that the FMLN's attempted conscription of Quiroz Parada would have served the dual goals of "fill[ing] their ranks in order to carry on their war against the government and pursue their political goals," *Elias-Zacarias*, 502 U.S. at 482, and of retaliating against the Quiroz Parada family—the latter is a protected ground, even if the former is not.

### B.

Having concluded that the evidence compels a finding that Quiroz Parada established past persecution on account of his familial relationship and imputed political opinion, we next address whether the agency erred in its alternative conclusion that even if Quiroz Parada *had* established past persecution, the government had successfully rebutted the attendant presumption of future persecution. It is on this issue that the severe delays Quiroz Parada experienced in the government's processing of his claims for relief become most relevant; those delays ultimately produced an agency decision unsupported by substantial evidence.

A petitioner who has suffered past persecution is presumed to have a well-founded fear of future persecution. *See* 8 C.F.R. § 1208.13(b)(1). The government may rebut that presumption if it establishes by a preponderance of the evidence that either (1) there "has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution," or (2) the "applicant could avoid future persecution by relocating to another part of the applicant's country of nationality." *Id.* The presumption only applies to fear of persecution "on the basis of the original claim," such that if the fear of future

persecution is "unrelated to the past persecution," the petitioner bears the burden of establishing he has a well-founded fear. *Id.*

Where the government submits "evidence of changed country conditions tending to rebut the presumption of a well-founded fear of persecution, the IJ must make an 'individualized determination' of how the changed circumstances affect the alien's specific situation." *Ali v. Holder*, 637 F.3d 1025, 1030 (9th Cir. 2011) (quoting *Marcos v. Gonzales*, 410 F.3d 1112, 1120–21 (9th Cir. 2005)). "Where past persecution has been established, generalized information from a State Department report on country conditions is not sufficient to rebut the presumption of future persecution." *Id.* (emphasis omitted) (quoting *Kamalyan v. Holder*, 620 F.3d 1054, 1059 (9th Cir. 2010)).

## 1.

Although the agency[9] determined that Quiroz Parada had not established past persecution, it alternatively concluded that even if he had established past persecution, DHS had rebutted the presumption. Specifically, the IJ considered the 2007 Department of State country conditions report adequate evidence that Quiroz Parada would "no longer face[] any fear related to the civil war or the FMLN" were he to return to El Salvador. The IJ did not acknowledge that by the time of the hearing, the country conditions report was five years out of date. The IJ did, however, briefly acknowledge that the FMLN had come to power "in recent

---

[9] Because the BIA's discussion of whether the government rebutted the presumption was limited to a brief, conclusory affirmance of the IJ's determination, we review the IJ's decision "as a guide to what lay behind the BIA's conclusion." *See Ornelas-Chavez*, 458 F.3d at 1058 (internal quotation marks and citation omitted).

years," but stated that "there was no evidence presented to the Court indicating that it participates in the killing, disappearance, forced conscription, or even discrimination against any individuals formerly affiliated with the government, such as the respondent and his family." Today, we join the Second Circuit and hold that reliance on significantly or materially outdated country reports cannot suffice to rebut the presumption of future persecution; as such, the agency's determination must be reversed. *See Tambadou v. Gonzales*, 446 F.3d 298, 302–04 (2d Cir. 2006); *Yang v. McElroy*, 277 F.3d 158, 163 (2d Cir. 2002).

Unlike fine wine, reports on country conditions do not improve with age—a reality that our colleagues on the Second Circuit have repeatedly acknowledged. In *Tambadou*, for example, the court granted a petition for review where the BIA's 2002 decision relied upon a 1996 country conditions report to determine that conditions had adequately changed in Mauritania such that the presumption of future persecution had been rebutted. 446 F.3d at 302–04. Given the six-year delay between the report's publication and the BIA's decision, the Second Circuit aptly observed that "it is difficult to see how the Report could be said to describe 'current' conditions." *Id.* at 303. Similarly, in *Yang*, the court granted a petition for review of a BIA decision affirming an IJ's determination that the petitioner had not established a well-founded fear of future persecution, because the IJ's decision had relied heavily on a 1993 country conditions report. 277 F.3d at 163. Noting that "current country conditions bear vitally as to asylum," the court reversed and remanded because "the administrative record is silent as to China's contemporary treatment of persons with backgrounds similar to [petitioner's]." *Id.* (internal quotation marks and citation omitted). The Second Circuit observed that while it was possible conditions had

not changed in the eight years between the 1993 country report and the time of its decision, "the consequences of deportation are simply too grave to leave this solely to surmise." *Id.*

The circumstances here are even more extreme and even more demanding of reversal than those in *Yang* and *Tambadou*. The country reports at issue in this case were already a half-decade out-of-date *by the time of the IJ hearing*—unlike in *Yang* and *Tambadou*, where the country conditions reports were relatively current at the time of the IJ hearings and only became out-of-date while the petitioners waited for their cases to be heard by the BIA and then the federal courts of appeals. The government gave no explanation for why it failed to submit more recent reports before the IJ hearing in 2012, nor can we discern any from our review of the record. The reports are now more than a decade out-of-date—although we note that the eleven-year gap between the reports' publication and our opinion today is still not as long as the thirteen years it took for DHS to process Quiroz Parada's asylum application.

But the staleness of the country conditions reports is not the most troubling part of the government's handling of Quiroz Parada's asylum claim. Quiroz Parada suffered past persecution by the FMLN on the basis of his family association and imputed political opinion. At the time of the 2007 country conditions reports, the FMLN had been reconstituted as a political party, but did not have control of either the Salvadoran legislature or the presidency. But in 2009—two years after the publication of the country conditions reports, and three years prior to the IJ hearing—

the FMLN rose to power.**[10]**  The IJ correctly observed that the 2007 country conditions reports did not mention any politically-motivated killings by the government or any mistreatment by the government of people whose families had fought against the FMLN in the civil war.  But this does not mean that there was any evidence in the record to rebut Quiroz Parada's fear that an *FMLN-run* government would engage in such persecution, because the FMLN had not yet taken power at the time of the 2007 reports.  Common sense dictates that the government cannot meet its burden of rebutting the presumption by presenting evidence of the Salvadoran government's human rights record at a time when the government was run by a different political party— particularly when the government is now run, as it was at the time of the IJ hearing, by the very same FMLN who persecuted the Quiroz Parada family.  The agency's determination that the presumption had been rebutted thus lacks substantial evidence.

### 2.

Because the agency's determination that the government successfully rebutted the presumption of future persecution is unsupported by substantial evidence, we hold that the presumption has not been rebutted and that Quiroz Parada is statutorily eligible for asylum and entitled to withholding of removal, and remand for the Attorney General to exercise his discretion under 8 U.S.C. § 1158(b) as to whether to grant asylum.  *See Baballah v. Ashcroft*, 367 F.3d 1067, 1078 n.11, 1078–79 (9th Cir. 2004); *Ndom v. Ashcroft*, 384 F.3d 743, 756 (9th Cir. 2004); *Mashiri v. Ashcroft*, 383 F.3d 1112, 1123 (9th Cir. 2004).  Particularly where, as

---

**[10]** Because the IJ noted that the FMLN had come to power "in recent years," we need not take judicial notice of this fact.

here, the government took thirteen years to process the asylum application and then another five years to hold a hearing before an IJ—during which time the government had every opportunity to submit more up-to-date evidence of changed country conditions, but failed to do so—"to provide the [government] with another opportunity to present evidence of changed country conditions . . . would be exceptionally unfair." *Ndom*, 384 F.3d at 756 (quoting *Baballah*, 367 F.3d at 1078 n.11). Such circumstances implicate our previously-expressed concern that "constant remands to the BIA to consider the impact of changed country conditions occurring during the period of litigation of an asylum case would create a 'Zeno's Paradox' where final resolution of the case would never be reached." *Baballah*, 367 F.3d at 1078 n.11 (quoting *Hoxha v. Ashcroft,* 319 F.3d 1179, 1185 n.7 (9th Cir. 2003)) (alteration omitted).[11]

## IV.

We next address whether the BIA erred in determining that Quiroz Parada failed to establish eligibility for CAT protection. We conclude that we have jurisdiction to review his CAT claim and that the agency committed several reversible errors in its analysis.

## A.

As an initial matter, we reject the government's contention that we lack jurisdiction to consider Quiroz

---

[11] Because we conclude that the unrebutted presumption of future persecution makes Quiroz Parada eligible for asylum and entitled to withholding of removal, we need not address whether substantial evidence supports the IJ's determination that Quiroz Parada did not establish an independent well-founded fear of future persecution.

Parada's CAT claim because he did not raise it before the BIA. Although Quiroz Parada did not specifically appeal his CAT claim to the BIA, the agency addressed the merits of the claim. It is well-established that we may review any issue addressed on the merits by the BIA, regardless of whether the petitioner raised it before the agency. *See Rodriguez-Castellon v. Holder,* 733 F.3d 847, 852 (9th Cir. 2013), *cert. denied*, 135 S. Ct. 355 (2014). Accordingly, we have jurisdiction to review the claim.

### B.

The BIA's[12] adjudication of Quiroz Parada's CAT claim requires reversal because the agency ignored pertinent evidence in the record—in violation of our precedent and CAT's implementing regulations—and erred by construing the "government acquiescence" standard too narrowly. To obtain relief under CAT, a petitioner must prove that it is more likely than not that he or she will be tortured in the country of removal. 8 C.F.R. § 1208.16(c)(2). The torture must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). For those not subject to mandatory denial of withholding, CAT eligibility entitles the petitioner to withholding of removal under 8 C.F.R. § 1208.16(c). *See Hosseini v. Gonzales*, 471 F.3d 953, 958 (9th Cir. 2006).

The agency's first error was its failure to consider all relevant evidence. CAT's implementing regulations

---

[12] As the BIA's discussion of Quiroz Parada's CAT claim was limited to a single sentence affirming the IJ's conclusion, we review the IJ's decision "as a guide to what lay behind the BIA's conclusion." *See Ornelas-Chavez*, 458 F.3d at 1058 (internal quotation marks and citation omitted).

explicitly require the agency to consider "all evidence relevant to the possibility of future torture," and we have repeatedly reversed where the agency has failed to do so. *See, e.g.*, *Cole v. Holder*, 659 F.3d 762, 770–72 (9th Cir. 2011) ("[W]here there is any indication that the BIA did not consider all of the evidence before it, a catchall phrase [that the agency has considered all of the evidence] does not suffice, and the decision cannot stand."); *Aguilar-Ramos v. Holder*, 594 F.3d 701, 705 (9th Cir. 2010) ("The failure of the IJ and BIA to consider [relevant evidence] constitutes reversible error."). Relevant evidence includes the petitioner's testimony and country conditions evidence. *See Cole*, 659 F.3d at 771–72. Moreover, a petitioner's credible testimony "may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 1208.16(c)(2).

Here, the relevant evidence included Quiroz Parada's credible testimony, the 2007 country conditions reports, and exhibits submitted by Quiroz Parada. Yet the IJ summarily dismissed Quiroz Parada's CAT claim, stating:

> Based on the respondent's testimony and the evidence in the record, the Court finds that the respondent has not shown that he is "more likely than not" to be tortured if he is removed to El Salvador. In addition, to be eligible for CAT relief, the respondent must establish that the torture feared would be inflicted by or with the acquiescence of a public official or other person acting in an official capacity. *Matter of S-V-*, 22 I&N Dec. 1306, 1311 (BIA 2000), *disagreed with on other grounds by Zheng v. Ashcroft*, 332 F.3d 1186 (9th Cir. 2003). "Article 3 of the Convention Against Torture does not

extend protection to persons fearing entities that a government is unable to control." *Id.* at 1312. The respondent has not alleged that he fears torture inflicted by any governmental entities in El Salvador, nor by any other entity with the acquiescence of any government official. Thus, he has not established eligibility for CAT relief.

This conclusion ignored significant evidence in the record demonstrating that 1) Quiroz Parada credibly feared death at the hands of the MS gang, and 2) the country conditions reports and other evidence in the record established not only that the government "acquiescence[d]" in the MS gang's violence, but also that Salvadoran security forces engaged in torture on a regular basis—as the IJ himself found in a section of his decision summarizing the country conditions evidence:

> [P]rotection of human rights was undermined by widespread violent crime, rampant judicial and police corruption, intimidation by the ubiquitous violent street gangs, and violence against witnesses. Criminal gangs are a serious, widespread, and pervasive socio-economic challenge to the security, stability, and welfare of El Salvador. Indeed, gangs are blamed for the bulk of crimes and murders in El Salvador. While the government's fight against the gangs has met with some success in areas, El Salvador remains an exceptionally violent country because of the pervasive gang violence.

> Although arbitrary arrest, prolonged detention, and torture are prohibited in El Salvador, Salvadoran security forces apparently continue to participate in such practices on a regular basis. Conditions in detention are degrading and extremely dangerous. Many officials throughout all levels of government engage in corruption with impunity despite a recent increased emphasis on enforcement.

Thus, while the IJ did "consider" the country conditions reports, the significant and material disconnect between the IJ's quoted observations and his conclusions regarding Quiroz Parada's CAT claim indicate that the IJ did not properly consider all of the relevant evidence before him. *See Cole*, 659 F.3d at 771–72 (explaining that indications of the agency's failure to properly consider all of the relevant evidence "include misstating the record and failing to mention highly probative or potentially dispositive evidence").

The agency's second error was its overly narrow construction of the "acquiescence" standard. In a similar case, we reversed and remanded where the agency "erred by construing 'government acquiescence' too narrowly," noting that "acquiescence does not require actual knowledge or willful acceptance of torture; awareness and willful blindness will suffice." *Aguilar-Ramos*, 594 F.3d at 705–06 (citing *Zheng v. Ashcroft*, 332 F.3d 1186, 1194–95 (9th Cir. 2003)). In *Aguilar-Ramos*, we found "evidence in the record that suggests that gangs and death squads operate in El Salvador, and that its government is aware of and willfully blind to their existence." *Id.* at 706. So too here.

Moreover, we have held that the acquiescence standard is met where the record demonstrates that public officials at any level—even if not at the federal level—would acquiesce in torture the petitioner is likely to suffer. *Madrigal v. Holder*, 716 F.3d 499, 509–10 (9th Cir. 2013). Evidence showing widespread corruption of public officials—as the record reveals here—can be highly probative on this point. *See id.* at 510 (noting that "[v]oluminous evidence in the record explains that corruption of public officials in Mexico remains a problem"). As in *Madrigal*, the country conditions reports and exhibits submitted by Quiroz Parada indicate the acquiescence of the Salvadoran government (or at least parts of the Salvadoran government) in the "rampant" violence and murder perpetrated by the MS gang—at whose hands Quiroz Parada fears that he will be killed. And as we have previously held, "torture" under CAT includes killings. *See Cole*, 659 F.3d at 771.

Because the agency erred by failing to consider all relevant evidence and by improperly construing the government acquiescence standard, we reverse the BIA's determination that Quiroz Parada is not eligible for CAT relief and remand to the agency for further consideration of his claim.

## V.

We conclude that Quiroz Parada suffered past persecution on account of his family association and imputed political opinion, and that the presumption of future persecution has not been rebutted. Under these circumstances, he is eligible for asylum, and entitled to withholding of removal. We remand to the BIA for the agency to reconsider Quiroz Parada's claim for relief under CAT, for the Attorney General to exercise his discretion as

to whether to grant Quiroz Parada asylum, and for an appropriate order withholding Quiroz Parada's removal.

**PETITION GRANTED; REMANDED.**